**In re John B. LOVE, d/b/a Record Coin Shop, Debtor.**

No. 91–41556–11.

United States Bankruptcy Court,
D. Montana.

Dec. 16, 1993.

Steven M. Johnson, Church, Harris, Johnson & Williams, Ward E. Taleff, Great Falls, MT, for Unsecured Creditors Committee.

Jennie Deden Behles, George M. Moore, Behles–Giddens, P.A., Albuquerque, NM, applicant and atty., Doug James, Billings, MT, Atty., for debtor-in-possession.

Neal G. Jensen, Great Falls, MT, Asst. U.S. Trustee.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

At Butte in said District this 16th day of December, 1993.

In this Chapter 11 case, Jennie Deden Behles ("Applicant"), attorney for the Debtor-in-Possession ("DIP), filed a second fee application on August 4, 1993, requesting attorney's fees in the amount of $71,377.50, costs of $15,701.71, and $4,131.83 for New Mexico gross receipts tax. Objections to the fee application have been filed by the U.S. Trustee, the unsecured creditors Mountain Bank and Farmers State Bank of Conrad, and the Unsecured Creditors' Committee ("UCC"). Applicant filed a response addressing such objections.

On September 16, 1993, the Court entered an agreed Order authorizing the submission of affidavits. Affidavits of the Debtor, both of UCC's co-counsel, the Applicant, Dave Ingalls, and a New Mexico court reporter were filed and considered by the Court. On September 20, 1993, the Applicant requested the Court take judicial notice of 67 matters in this case and related adversary proceedings. The UCC went further, requesting on September 21, 1993, that the Court take judicial notice of all pleadings and Orders filed in this case. Without objection, the Court has again reviewed the entire Chapter 11 file.

After due notice, a hearing on this fee application was held at Great Falls on Sep-

tember 21, 1993. The Assistant U.S. Trustee appeared and advised the Court that all of the litigation in this case has been or is about to be concluded. With no further testimony or exhibits offered into evidence on the fee application, except the affidavits, the Court took the matter under advisement. After considering all the matters listed above, this matter is ready for decision.

The pending application and objections present three issues. First, whether Applicant failed to comply with F.R.B.P. 2014(a) to disclose in timely fashion that Applicant's law firm represented Dave Ingalls, the Debtor's partner in Sante Fe Rarities partnership ("SFR"), in Ingalls' Chapter 13 bankruptcy case filed in the U.S. Bankruptcy Court for the District of New Mexico during the pendency of this case. Second, whether Applicant's fee request is unreasonable in light of Applicant's $12,500 to $25,000 estimate of Applicant's attorney's fees, tax, and costs filed with this Court and presented to the UCC members in soliciting their votes to accept the DIP's pre-packaged Chapter 11 Plan. Third, whether the services set forth in the fee application are reasonable and necessary to the estate, or whether such services were in fact rendered for the benefit of the Debtor, John B. Love, individually and for the Debtor's family and insiders. Upon review of the record, the Court concludes from the record that all three issues weigh against the Applicant, and thus the Court disallows any further compensation to Applicant.

This Chapter 11 case was a "pre-packaged" bankruptcy when the DIP filed a voluntary Chapter 11 petition on September 20, 1991. Applicant filed an application for employment as attorney for the DIP on September 23, 1991. Attached to the employment application is Applicant's sworn declaration, in which the Applicant discloses that Applicant's law firm represented the DIP with pre-petition planning, preparation and solicitation of acceptance of the Plan and Disclosure Statement. Applicant states as to being a disinterested person:

3. But for the firm's previous representation of the Debtor neither the law firm nor its associates or shareholders have any connection with the Debtor, creditors or any other party in interest and their respective attorneys and accountants.

Based upon the employment application, disclosure, and the absence of any objection, the Court entered an Order approving the employment on September 25, 1991. The DIP's Chapter 11 liquidating Plan was confirmed by the Court on November 26, 1991. All of the fees and costs requested in the instant fee application were incurred after the confirmation date.

Extensive case law has developed regarding fees requested from bankruptcy estates. This Court has compiled many of them in *In re WRB–West Associates*, 9 Mont.B.R. 17, 18–20, 1990 WL 517058 (Bankr.Mont.1990):

Pursuant to 11 U.S.C. §§ 327–330 and Bankruptcy Rules 2016 and 2017, this Court has an independent judicial responsibility to evaluate fees requested from the estate. *In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 831 (Bankr.Vt.1987); *In re Seneca Oil Co.*, 65 B.R. 902 (Bankr.W.D.Okla. 1986); *In re Frontier Airlines, Inc.*, 74 B.R. 973 (Bankr.Colo.1987). The burden of proof to show entitlement to all fees requested from the estate is on the applicant. *In re Lindberg Products, Inc.*, 50 B.R. 220, 221 (Bankr.N.D.Ill.1985). This burden is not to be taken lightly, especially given the fact that every dollar expended on fees results in a dollar less for distribution to creditors of the estate. *In re Yankton College*, 101 B.R. 151, 158 (Bankr.S.C. [S.D.] 1989); *In re Pettibone Corp.*, 74 B.R. 293, 305 (Bankr.N.D.Ill.1987). All expenses and fees must be shown as both actual and necessary under § 330(a)(2) of the Code. *S.T.N.*, supra at 834; *Yankton College*, supra at 158; *Seneca Oil*, supra at 912.

The confirmation Order approved a stipulation between the DIP and the UCC, filed November 19, 1993. That stipulation is incorporated by its terms into the Plan, and only with its approval did the UCC vote to accept the DIP's Plan. In reaching the stipulation, the parties agree that there was considerable discussion relating to the possibility of high administrative expenses in the form of attorney's and other professional

fees. The Applicant contends that Applicant asserted only that the fees would be less in a pre-packaged Chapter 11 than in a contested Chapter 11 case. The objecting creditors contend that they relied on the Applicant's representations and Applicant's estimate of fees filed November 4, 1991, wherein Applicant estimated Applicant's fees and costs at between $12,500 to $25,000, depending on which matters are handled by Applicant or the UCC.

The stipulation between the DIP and the UCC provides for the DIP to have a right of first refusal to initiate several enumerated adversary proceedings and contested matters to recover assets for the estate. If the DIP failed after the UCC written 5-day demand notice to initiate such action, then the UCC could pursue such action. On April 17, 1992, the UCC sent the DIP a five-day notice demanding the DIP initiate fourteen adversary proceedings, including proceedings to void transfers and settlements between the DIP and DIP's family members, First State Bank of Shelby, and to recover a transfer of $40,000 made by the DIP to SFR. On April 20, 1992, Applicant responded to the demand with a letter requesting further information. The UCC then proceeded with the litigation.

### A. Rule 2014(a) Disclosure.

■ The first issue is whether Applicant violated Rule 2014(a) when Applicant failed to disclose Applicant's law firm's representation of Dave Ingalls in a Chapter 13 case in New Mexico while the instant case was pending. An applicant for employment as a professional is required to disclose all of the applicant's connections with the debtor, creditor, and any other party in interest. F.R.B.P. 2014(a); *In re Granite Sheet Metal Works, Inc.*, 159 B.R. 840, 845 (Bankr.S.D.Ill. 1993) (purpose of Rule 2014(a) is to permit the court and parties in interest to determine whether certain legal connections disqualify the applicant).

According to Applicant's amended affidavit of disinterestedness, filed July 29, 1993, Applicant's law firm represented Ingalls in a Chapter 13 bankruptcy proceeding in another district beginning March 5, 1992. Ingalls was John Love's partner in SFR. According

to the DIP's Disclosure Statement and attachments, SFR had a book value in the amount of $40,000, but a liquidation value of $1.

Applicant's letter and memorandum prepared February 1993, reveal that the DIP transferred $40,000 to SFR within a year of the bankruptcy petition. Applicant argued that the transfer was not a fraudulent transfer because the DIP received fair consideration in exchange. In Applicant's reply to a UCC demand letter of April 10, 1992, Applicant argued against the UCC's proposed action to void the transfer to SFR because it had no determination of value.

When the Applicant was advancing these arguments on behalf of the Debtor (or possibly Ingalls), Applicant failed to reveal that Applicant's law firm represented Ingalls, the DIP's sole partner in SFR, since March 5, 1992, a month before the Applicant responded to the UCC's 5-day demand. In other words, Applicant's law firm represented both partners of an entity into which $40,000 of estate funds disappeared, without disclosing that dual representation even while arguing against the UCC's proposed action against SFR to void the transfer of the $40,000.

Applicant contends there was no conflict of interest because the Ingalls Chapter 13 did not list the DIP as a creditor, or file a claim in the DIP's Chapter 11. The UCC, Applicant asserts, is trying in bad faith to invent a conflict of interest, where none exists.

The Court need not determine whether a conflict of interest exists from the present record. It is undisputed that the Applicant failed to disclose Applicant's firm's representation of Ingalls to this Court until July 29, 1993.

Applicant argues that Ingalls is not the same entity as SFR, the purported beneficiary of the preference. Ingalls' deposition reveals that Ingalls invested in inventory which resulted in a loss of $40,000 in less than one year.

Q. And, again, where did you say the inventory is now physically located in?

A. [Ingalls] In the trunk of my car.

Q. And what does that inventory consist of?

A. Trading cards, sports cards.

Q. Baseball trading cards?

A. Football, a lot of football.

Q. Who made the investment in these cards?

A. I did.

Q. So, I take it, you are an expert in the area?

A. No, I don't know anything about it.

Q. Okay. Based on what material did you make investment in trading cards?

A. I got talked into a pretty sizeable one, because it was supposedly going to be the hot thing. The market is pretty much gone. But I am not sure that was a smart decision. . . .

The Court finds that Applicant represented an interest adverse to the estate when, failing to disclose the representation of Ingalls to the Court or to the UCC, Applicant argued against the UCC's demand to proceed against SFR, when Applicant in fact represented both partners of SFR.

Recently this Court addressed in detail the disclosure requirement of Rule 2014(a) in *In re Fjeldheim*, 12 Mont.B.R. 267, 274–279, 1993 WL 590145 (Bankr.Mont.1993), which I quote at length:

This Court has consistently strictly interpreted the duty of a professional employed by an estate to disclose conflicts of interest under F.R.B.P. 2014, *In re Perino*, 8 Mont. B.R. 119, 123 (Bankr.Mont.1989); retainers, *In re Bob's Supermarkets, Inc.*, 10 Mont.B.R. 240, 247–250 (Bankr.Mont. 1992), *aff'd* 12 Mont.B.R. 114, 126–127 (9th Cir.BAP 1992); and terms of compensation such as fee sharing arrangements under F.R.B.P. 2016, *In re Hart–Albin Co.*, 10 Mont.B.R. 486, 494–496.

\*  \*  \*  \*  \*  \*

In *Bob's Supermarkets*, this Court disallowed $10,000 of the DIP's law firm's fees, later reduced to $5,000, for failure to disclose a retainer agreement in the employment application as required by Rule 2014(a), even though the retainer was included in the Debtor's statement of financial affairs and fee application. 10 Mont. B.R. at 246–250. This Court asserted its

power to disallow or order disgorgement of all fees for failure to disclose, and rejected the attorney's argument that the rules require no disclosure of retainer agreements. *Id.* In affirming this Court's Order, the Bankruptcy Appellate Panel for the U.S. Ninth Circuit wrote:

We previously adopted the position that a bankruptcy court has the discretion to sanction a firm for its mistakes. *See, In re Film Ventures Int'l*, 75 B.R. 250, 252 (9th Cir.BAP 1987). "Anything less than the full measure of disclosure leaves the counsel at risk that all compensation may be denied." *In re Saturley*, 131 B.R. 509, 516–517 (Bankr.D.Me. 1991) (citing *In re Futuronics Corp.*, 655 F.2d 463 (2d Cir.1981), *cert. denied* 455 U.S. 941, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982)).

We acknowledge Dixon does not have a history of neglecting its duty of disclosure to the bankruptcy court. However, we also recognize the court's concern that the applicant should have some fee reduction to impose upon the applicant and the community the importance of full disclosure. Accordingly, we find that the court exercised the proper discretion initially setting the penalty at $10,000 and later reducing it is $5,000.

\*  \*  \*  \*  \*  \*

This Court is not alone in strictly interpreting the professional's duty of full disclosure. In addressing Rule 2014(a), the court in *Dynamark*, [137 B.R. 380], cited by Cook [DIP's counsel], wrote:

Proposed counsel for a debtor-in-possession is required to fully disclose all relationships with the debtor, creditors, or any other party in interest. [F.R.B.P.] 2014(a).

137 B.R. at 381.

Rule 2014(a) requires the professional to disclose all facts that *may* be pertinent. [*In re*] *Hathaway* [*Ranch Partnership*], 116 B.R. [208] at 219 [1990]. Further, "a negligent failure to disclose all facts required by [Rule] 2014(a) does not relieve the professional of the consequences of

failing to make a complete disclosure." *Id.* at 219–220.

In support of a broad reading of Rule 2014(a), one court aptly wrote:

This determination protects the bankruptcy system. In addition, professionals seeking employment with estates will have fewer problems determining which connections are to be disclosed for all connections must be disclosed. The professional cannot pick and choose which connections to disclose. No matter how old the connection, no matter how trivial it appears, the professional seeking employment must disclose it. The court and interested parties are then informed and the professional does not run the risk of serving the estate *pro bono.*

*In re EWC,* 138 B.R. 276, 281 (Bankr. W.D.Okl.1992).

Not all courts read Rule 2014(a) so broadly:

This is not to say that every possible connection need be disclosed by counsel. Rule 2014 does not require an attorney to dredge up every past connection, however, remote, that he or she ever had with the parties in interest in the case. For example, the fact that Chatz and Grossman owned a hot dog stand together 20 years ago is such a remote connection that it is *de minimis* and irrelevant to the § 327 analysis. What is important are connections that presently exist or recently existed between the attorney and the parties in interest, and also past connections of business or personal nature that are either related to the bankruptcy proceedings or could reasonably have an effect on the attorney's judgment in the case.

*In re Rusty Jones, Inc.,* 134 B.R. 321, 346 (Bankr.N.D.Ill.1991).

Under either above view, Cook should have disclosed that Gloria and Blazek were creditors and the source of the retainers. Neither may Cook claim that, because the agreements with and retainers from Gloria and Imelia occurred after employment was approved, they were not under a duty to disclose them. As the court in *EWC* wrote:

[I]f a person has *at any time* during employment by the estate, any "connections ..." pursuant to [F.R.B.P.] 2014(a), and fails to disclose those "connections" to the best of his or her knowledge, it is necessary and appropriate that employment of that person must be set aside to carry out the provisions of the Bankruptcy Code. Any request for compensation also must be denied, and any compensation received must be disgorged.

\* \* \* \* \* \*

Any professional who holds or represents an interest materially adverse to the estate and is employed by the estate as a consequence of a violation of the disclosure rules, *or comes into that conflict subsequent to employment,* is not an officer of the estate during the time of the conflict and therefore is not entitled to compensation under § 330(a).

138 B.R. at 280–281 (citing, *inter alia,* [*In re*] *Amdura,* 121 B.R. [862] at 869 [(Bankr.D.Colo.1990)]). (Emphasis added).

It was not this Court's nor anyone else's duty other than Cook's to make full disclosure. Nor was it full disclosure for Cook to disclose what it thought sufficient and then to correct any deficiencies to which the U.S. Trustee objected. This Court wrote in *Bob's Supermarkets:*

[I]t is not enough that the retainer agreement is disclosed somewhere in the file. "The Court has no duty to search the file to ferret out information of actual or potential adverse interests or other evidence of noncompliance with 11 U.S.C. § 327. It is the attorney's duty to so warn the court. *In re Roberts,* 46 B.R. 815 at 839 (Bankr. D.Utah 1985)." *In re Automend,* 85 B.R. [173] at 178 [(Bankr.N.D.Ga.1988)].

10 Mont.B.R. at 250.

Other courts also reject any indication that it is anyone else's duty to search the file for any conflicts of interest. *Hathaway,* 116 B.R. at 219; *In re TMA Associates, Ltd.,* 129 B.R. 643, 648 (Bankr.D.Colo. 1991) (the court has no duty to search the file, citing *Hathaway* and *In re Roberts,* 75 B.R. 402, 410 (D.Utah 1990)); *Rusty*

*Jones,* 134 B.R. at 345 ("the Court has no duty to rummage through files or conduct independent fact-finding investigations in order to determine whether prospective attorneys are involved in actual or potential conflicts of interest. It is the duty of the attorney to so inform the Court.... [citation omitted] Thus, Rule 2014(a) must be read broadly."); *EWC,* 138 B.R. at 280 (professionals must disclose all connections and fee arrangements. "The bankruptcy court has neither the obligation nor the resources to investigate the truthfulness of information supplied, or to seek out conflicts of interest not disclosed. [citations omitted] As a consequence, professionals employed for the estate are nearly self policed.")

Besides relieving the courts of any duty to investigate, in *In re Marine Outlet, Inc.,* 135 B.R. 154, 156 (Bankr.M.D.Fla.1991), Judge Paskay wrote:

> There is no duty placed on the United States Trustee or on creditors to search the record for the existence, vel non, of a conflict of interest of a professional sought to be employed. On the contrary, there is a definite affirmative duty placed on a professional to disclose his or her connection with parties whose interest is or may be antagonistic or opposite to the interest of the general estate and a failure to comply with the mandate of Bankruptcy Rule 2014(a) merits a total forfeiture of all fees. *In re B.E.S. Concrete Products, Inc.,* 93 B.R. 228, 237 (Bankr.E.D.Cal.1988).

Cook's argument that the U.S. Trustee's concession that Cook is disinterested solves any disclosure problem is related to the argument that *Hathaway* 's holding on the disclosure requirement is secondary. This Court rejects that argument as not supported by the language of *Hathaway* or other cases. 116 B.R. at 219–221; *EWC,* 138 B.R. at 280. As the court wrote in *EWC:* "Violation of the disclosure rules is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connections or fee arrangements were materially adverse to the interests of the estate or were *de minimis.*" 138 B.R. at 280 [Other citations omitted].

The court also wrote: "Although the remedies are similar, violation of the disclosure rules and violation of the disinterestedness requirements are independent." *Id.* at 281.

Applicant had the duty to disclose Ingalls' legal representation, but did not do so until over a year had passed. Applicant states: "Behles does not believe that a representation of Ingalls effected her disinterestedness in anyway [sic] or is cause for disclosure. However, in the interest of harmony, Behles has made this disclosure." This argument is out of harmony with Rule 2014(a).

If Applicant had disclosed to the UCC and the Court Applicant's dual representation of Ingalls and Love at the time of the UCC's 5-day demand letter, it is probable that revelation of such representation would have prompted action to disqualify Applicant at that time. At the very least, the UCC should have had that opportunity presented to it by full disclosure.

The fact urged by the Applicant that no adversary proceeding against SFR was in fact filed is not important, in part because of Applicant's efforts against such an action while representing both partners. What is known, however, is that $40,000 in estate funds has disappeared into trading cards purchased by Ingalls, Applicant's client. The Court concludes that such representation may have constituted an interest adverse to the estate. Such representations were required under Rule 2014(a) to be timely disclosed to the Court and parties in interest.

> Failure to make the disclosure required by Bankruptcy Rule 2014 may result in disqualification of counsel in the instant case and any related case. *In re Lee,* 94 B.R. [172] at 177 [ (Bankr.C.D.Cal.1988) ]. If the lack of disclosure is discovered after employment is approved, it may also result in denial and disgorgement of compensation. [Citations omitted]

*In re Hathaway Ranch Partnership,* 116 B.R. 208, 219–220 (Bankr.C.D.Cal.1990); *In re Granite Sheet Metal Works, Inc., supra* at 845.

■ The Court has the discretion to disqualify Applicant, deny all fees, and order disgorgement of the pre-petition fees. There

are several factors which weigh in favor of full disgorgement. First, this is the second instance Applicant failed the duty of disclosure, the first being Applicant's failure to disclose the pre-petition payment of $52,779.87. Second, Applicant is an experienced bankruptcy practitioner and familiar with the duty of disclosure, but erroneously insists that disclosure of the Ingalls representation is not required and was done only in the interest of harmony. Third, Applicant argued against proceeding against SFR while at the same time failing to disclose the representation of Ingalls, the SFR partner who squandered $40,000 in estate funds. Applicant's argument that the UCC had insufficient valuation information rings hollow when considered in light of Applicant's undisclosed representation of the person who could provide that information.

■ Admittedly, disqualification and disallowance of all fees is a harsh remedy, when Applicant provided extensive services for the estate, which even the UCC and U.S. Trustee admit were beneficial to the estate. Applicant did belatedly disclose the representation "in the interest of harmony" albeit more than a year after the fact. Due to the admitted benefits of some legal services to the estate, the Court will not disqualify Applicant and disallow all fees. For the failure to timely disclose Applicant's representation of Ingalls, for Applicant's insistence that disclosure is not required under Rule 2014(a), and for the reasons further set forth below on the two remaining issues, Applicant's fees, costs, and taxes in this case shall be limited to those awarded by this Court by Order entered December 2, 1992, and no further fees or costs will be allowed.

### B. Fee Estimate.

■ The second issue is whether Applicant's fees should be limited by Applicant's estimate of fees filed November 4, 1991, wherein Applicant estimated that Applicant's fees would total between $12,500 and $25,000. That estimate is far short of Applicant's actual fee requests. Applicant's first fee application requested over $37,600. Of that, the Court awarded $25,226.23, and in addition approved $52,779.87 in pre-petition fees which Applicant failed to disclose under 11 U.S.C. § 329 and F.R.B.P. 2016(b). The instant application requests over $91,000 in additional fees, costs, and taxes, for an approximate total of Applicant's fees for the entire bankruptcy case of almost $170,000, or almost seven times Applicant's estimate.[1] And, Applicant states there is yet a third fee application to come. According to the fee application, there are assets totalling $577,832.05 and claims against the estate of $2,306,835.

The creditors contend they relied on Applicant's $12,500 to $25,000 estimate in agreeing to accept the Plan. Applicant replies that there was no reliance by the UCC on the estimate set forth in the stipulation, that the estimate was in good faith and reasonable in light of the Plan, that the UCC harassed and harangued the DIP causing Applicant's fees to be incurred in response, and thus the fees were unforeseeable at the time of the estimate.

Applicant's response cites *In re Seneca Oil Co.*, 65 B.R. 902 (Bankr.W.D.Okl.1986) for the proposition that unforeseeable administrative expenses will be allowed absent prior disclosure, and significant variance from an estimate of administrative expenses by a plan proponent will be permitted where justified. The court in *Seneca Oil* wrote:

> To be allowed, administrative expenses must be disclosed. It should not be left to the interested parties and the court to guess what expenses may be incurred. The burden is on the plan proponent to disclose all reasonably foreseeable fees and expenses that may be claimed as costs of administration.
>
> \*    \*    \*    \*    \*    \*
>
> A plan proponent ... who intends to apply for reimbursement of fees and expenses must specifically estimate its costs in the disclosure statement or they will be disallowed. [Citing cases]. Significant vari-

---

1. It cannot be overemphasized that at the time the estimate of fees was made, the Applicant had failed to disclose the pre-petition payment of $52,799 to the UCC.

ance from estimates will not be permitted without justification.

65 B.R. at 906–907.

Applicant's fee request is a significant variation from Applicant's estimate, and thus must have justification. The stipulation filed November 19, 1991, was approved in the confirmation Order. By the terms of the stipulation incorporated into the Plan, the UCC may pursue any adversary proceeding or contested matter it deems necessary after first giving the DIP five (5) days written notice to prosecute such action. An exhibit to the stipulation lists eighteen (18) nonexclusive matters to which the UCC may invoke the 5 day notice. Furthermore, the stipulation provides that the DIP consents to the UCC's actions taken under the Plan provision. By reason of such circumstance, the Court finds that the UCC's actions in invoking the 5 day notice to initiate and pursue the various adversary proceedings and contested matters, and the fees incurred thereby, were reasonably foreseeable.

The Applicant contends that neither the UCC's fees in pursuing these matters nor the Applicant's future fee requests were included in the fee estimate. The stipulation was filed November 19, 1991, two (2) weeks after Applicant's fee estimate was filed November 4, 1991. The Applicant did not amend or supplement the estimate after negotiating the stipulation with the UCC. Applicant should not benefit from the failure to amend the estimate to reflect the fees which would result from litigation contemplated by the UCC, which surely was discussed by the parties in the negotiations leading up to the stipulation.

What may not have been foreseeable is the DIP's response to the UCC's 5–day demand notice dated April 17, 1992, whereby the UCC invoked its right pursuant to the stipulation to initiate fourteen (14) adversary proceedings. The DIP, instead of initiating the proceedings, or stepping aside and allowing the UCC to proceed, responded on April 20, 1992, with demands for more information and arguments why such litigation should not proceed, i.e., Rule 11 concerns, lack of cost effectiveness, and insufficient information. One must remember that certain of these actions were against the DIP's family members, associates, and entities in which the DIP or the DIP's insiders held interests. With a few exceptions, Applicant's efforts in discouraging such litigation were directed more toward the benefit of the DIP personally and DIP's family and associates than the estate.

In a recent bankruptcy case, the court held an applicant to applicant's estimated fees when the debtor had relied on applicant's assurances that the fees would not exceed the estimates in deciding to hire the applicant. *In re Crown Orthodontic Dental Group,* 159 B.R. 307, 309–310 (Bankr. C.D.Cal.1993) states:

> Considering the status of this case at the time Movant became employed and a fee request more than *triple* the $25,000 estimate that Movant gave to Debtors, a total fee award of $77,569.25 appears on its face to be unreasonable and unfair. If an attorney estimates the cost of his or her services, and that estimate is a critical part of the negotiations which the client relies upon in employing the attorney, unless there are some real, unexpected changes of circumstances, the attorney should be bound by that estimate. A client should not have to pay three times what he expects to pay for legal representation without some justifiable reason. Movant did not provide good cause for the extensive overruns in this case.

> By Movant's own admission, $2,000 represents a reasonable estimate of fees for the unforeseeable work in this case. The initial estimate of $25,000 was a reasonable sum for Movant's services given that the case was already in its final stages. Combining these two figures with the amount that I set for the Vahed litigation represents a reasonable sum for Movant's services.

> After an extensive review of the relevant bankruptcy case law, I have found only one published case that examines professional's fees that significantly exceed the professional's estimate to the client. In *In re Chas A. Stevens & Company,* 105 B.R. 866 (Bankr.N.D.Ill.1989), Judge Squires confronted this disturbing issue while consid-

ering the excessive fees of a management consulting firm employed by the debtor. Judge Squires noted that:

> [a]lthough the court will not enslave professionals to the exact amount of their projected budgets, such forecasts must be given substantial weight when reviewing fee requests.... The court holds that when professionals, especially financial experts, project estimated fees or budgets to a clients, they should expect to be held to the same or some reasonable variation thereof. For [the applicant] ... to apply to this Court after such enormous overruns and expect payment in full is unrealistic and *unreasonable.*

*Stevens,* 105 B.R. at 870 (emphasis added).

The instant case includes an estimate given by Applicant as required by Mont. LBR 17(c). The Disclosure Statement does not specify what Applicant's fees might be. Although the court's reasoning in *Crown Orthodontic* hinged upon the fact that the debtor considered the fee estimate critical and relied upon it in employing the attorney, I do not see that distinction sufficient to prevent a similar analysis from applying here, where the UCC contends they relied on Applicant's $12,500 to $25,000 fee estimate in stipulating to confirmation of the Plan.

Applicant contends the UCC did not rely on the estimate, because the stipulation contains no reference to any such reliance. Such absence in the stipulation means nothing either way. Applicant signed the estimate and filed it two weeks before the stipulation was signed. The negotiations leading up to the stipulation included detailed discussions of litigation the UCC might demand. Yet, the estimate on record was not amended or supplemented at the time the stipulation was executed. Thus, Applicant should not benefit from failure to amend the estimates to reflect the additional fees for the litigation contemplated in the stipulation.

The Court finds the UCC was concerned about excessive professional fees in this case, just as excessive professional fees are a concern in virtually all Chapter 11 cases. Members of the UCC urged the DIP to file a Chapter 7 petition, and even filed an involuntary Chapter 7 petition which was settled when the UCC entered into the stipulation. Applicant's assurances that a pre-packaged Chapter 11 would result in lower fees, and Applicant's estimate of record, contributed to the UCC's stipulation to confirmation. The similarities between this case and *Crown Orthodontic* are greater than the differences.

The litigation by the UCC in this case was clearly contemplated, to be pursued by the DIP or the UCC. When the DIP failed to proceed, the UCC proceeded and incurred resultant professional fees.[2] The DIP having waived its right of first refusal, Applicant cannot now claim credit and the lion's share of fees for the successful outcome of the various adversary proceedings prosecuted by the UCC. Applicant's argument that the DIP had primary responsibility for consummation of the Plan is true, but the DIP forfeited that responsibility to the UCC by failing to initiate claims after the 5 day demand notice.

Applicant seeks a significant variance from the $12,500 to $25,000 estimate. I find that Applicant's additional fees were not unexpected. When coupled with Applicant's failure to disclose, the substantial degree to which Applicant's fee request exceeds the estimate justifies limiting Applicant's fees to those already awarded. As in *Crown Orthodontic,* Applicant's instant fee application alone, without regard to the earlier award of fees and the proposed third fee application, requests more than triple the $12,500 to $25,000 estimate. Applicant has not provided good cause for such extensive overruns, and will be limited to the $25,226.23 fees already awarded. That award represents the high

---

2. Indeed, the Court has already made interim awards to UCC's attorneys totalling $83,480 in fees and costs arising from their work, including the work expended on the adversary proceedings. In addition, there are still pending additional fee requests by the UCC's attorneys of $49,516. This case illustrates the danger of run-

away professional fees in a Chapter 11 reorganization case. Major fee awards in this case total approximately $139,928, with over $205,000 in additional fee requests still pending, including Applicant's instant fee application. Professional fees thus approach $345,000, or almost sixty percent of the $577,832 in estate assets.

end of Applicant's estimated fees, and when coupled with the $52,779.87 in pre-petition fees, represents a substantial attorney fee in a pre-packaged Chapter 11 case.

### C. Benefit To The Estate.

■ The third issue is whether Applicant should be compensated for services which were rendered for the benefit of the Debtor John Love individually and Debtor's family and associates instead of for the benefit of the estate. Such services include the opposition to the UCC's attempt to force disgorgement of the Debtor's unauthorized draws, and Debtor's participation individually in the settlements of the adversary proceedings against Debtor's spouse and child, and against First State Bank of Shelby.

■ Applicant contends, without citing any authority, that the UCC must take the Debtor as they find the DIP. When an attorney places the economic well being of a debtor's principal above that of the DIP, the attorney's compensation may be denied. *In re Granite Sheet Metal Works, Inc., supra* at 848. Such has occurred in the instant case where, in working to settle the adversary complaints against the DIP's family members and insiders, John Love individually agreed to borrow funds, purchase assets and pay the estate, thereby acting on the side of the Defendants, even though the DIP's estate was the Plaintiff.

The following excerpts from *Granite Sheet Metal Works* show the difficulties which arise when a debtor plays both sides of the fence.

Questions about the firm's ability to distance itself from the interests of David Partney and to represent the debtor in possession as "fiduciary for creditors free of any compromising attitudes fostered by ownership interests," *In re Black Hills Greyhound Racing Ass'n,* 154 B.R. [285] at 294 [ (Bankr.D.S.D.1993) ], should have been examined by the Court when it considered the employment application. In fact, given that David Partney became a guarantor of corporate debt to his brothers as a result of the stock redemption transaction and that he was also a co-debtor on corporate obligations to two banks, his interests and those of the debtor plainly

were no longer congruent when the bankruptcy case was filed. E.g., *id.* at 293–94; *In re Plaza Hotel Corp.,* 111 B.R. at [882] 890 & nn. 23–24 [ (Bankr.E.D.Cal.1990) ] (where controlling shareholders are guarantors of corporate debt, they face individual liability for the debtor's unpaid obligations and "have a powerful incentive to assure that they pay as little as possible by having the debtor pay as much as possible . . . [which] entails a correlative incentive to deprive the debtor of flexibility in formulating a plan of reorganization by introducing a strong bias for a particular treatment of a particular creditor, possibly at the expense of other creditors"); *In re Sixth Ave. Car Care Ctr.,* 81 B.R. 628, 630–31 (Bankr.D.Colo.1988).

159 B.R. at 847–848.

Thus, in negotiating a settlement where Love would personally borrow funds and pay them to the estate, Love would naturally attempt to minimize the amount payable, contrary to the interests of the estate. While the settlements undoubtedly brought some benefit to the estate, the Court finds that Applicant's efforts in promoting those settlements were primarily directed to the personal interest of the Debtor, and only coincidentally to the benefit of the estate.

Other language from *Granite Sheet* fits the instant facts:

It is obvious that counsel, after the bankruptcy case was filed, continued to place the interests of David Partney above those of the debtor in possession in the protection and enhancement of the estate. This is shown by the Debtor's opposition to the lowering of David Partney's salary and by the overly generous terms set forth in the plan of reorganization for David's repayment of his loan from the debtor.

*Id.,* 159 B.R. at 848.

Applicant's efforts at preventing disgorgement of the DIP's draws urged by the UCC likewise placed the interests of John Love above those of the estate. As the court continues in *Granite Sheet:*

Counsel's decision to render legal advice and to give consideration to the economic well-being of David Partney personally at

the expense of debtor's unsecured creditors reflected a primary allegiance to the debtor's controlling shareholder rather than to the debtor. See, e.g., *In re United Utensils Corp.,* 141 B.R. 306, 308–309 (Bankr.W.D.Pa.1992); *In re Roger J. Au & Son, Inc.,* 65 B.R. 322, 334–35 (Bankr. N.D.Ohio 1984), aff'd, 64 B.R. 600 (N.D.Ohio 1986). The fact that counsel held itself out as representing only the debtor, while in reality serving another master, did not free counsel from the requirement of disinterestedness. See *In Re Kendavis Indus. Int'l, Inc.,* 91 B.R. 742, 751–53, 754 (Bankr.N.D.Tex.1988); *In re Chou–Chen Chemicals, Inc.,* 31 B.R. 842, 852 (Bankr.W.D.Ky.1983).

The law firm's representation of an interest adverse to the estate is shown as well by the stonewalling which occurred in response to the committee's requests that the debtor investigate potential claims against insiders to recover assets transferred as a result of the stock redemption transaction. Whether or not the claims raised in the committee's adversary case have merit remains undetermined. However, the debtor in possession was derelict in refusing to investigate the transfers and in failing to rebut the committee's serious charges. See *In re Temp–Way Corp.,* 95 B.R. [343] at 344–46 [ (Bankr.E.D.Pa. 1989) ]. Its inaction was based, not on deference to the committee's decision to proceed with litigation, but rather on David Partney's attitude, as reflected during this Rule 2004 examination, that he would not renege on the promises he had made to his brothers. Counsel's failure to insist that the debtor fulfill this obligation placed the law firm in a position adverse to the interests of the estate. Due to the concerns of its controlling shareholder, the debtor was not fulfilling its fiduciary obligation to the bankruptcy estate, and it was the duty of the debtor's counsel to bring these matters to the Court's attention. See, e.g., *In re United Utensils Corp.,* 141 B.R. at 309.

Having found that counsel failed to make the full and candid disclosure required by Bankruptcy Rule 2014(a), and that counsel was, from the inception of the bankruptcy case, not qualified to represent the debtor, the Court will not allow compensation and costs to be paid to counsel from the estate for any services performed after the entry of the order for relief.

159 B.R. at 848.

I find similar stonewalling by the DIP in the instant case by Applicant failing to investigate the UCC's allegations and in resisting the UCC's efforts to unravel the DIP's byzantine business dealings. Applicant's arguments that litigation against the DIP's family members and associates was without merit and not cost-effective lose their potency in light of the family business connections. The DIP is not relieved of the fiduciary duty to the creditors under Chapter 11 because of close family and business relationships. If a debtor deems those relationships compelling, that debtor should not assume the fiduciary duty under Chapter 11.

Applicant cites *In re Murray,* 132 B.R. 808 (Bankr.D.Mass.1991) for the proposition that where a debtor's affairs are so intertwined with matters of the estate that it is both impossible and unwise to attempt a severance, it is appropriate for the estate to pay for the debtor's legal fees. This Court does not consider the *Murray* reasoning applicable here for several reasons. First, as the court in *Murray* admits, the result reached in *Murray* is limited to "the peculiar circumstances of this case." *Murray,* 132 B.R. at 810. Second, *Murray* involved fees incurred defending adversary proceedings to have claims held nondischargeable, in addition to RICO, ERISA, fraud and conversion allegations, which involved issues "virtually the same as the elements of proof of nondischargeability." *Id.* at 810. Third, *Murray* admittedly followed a minority view that a rigid rule to disallow fees rendered defending a nondischargeability action is inappropriate. *Id.* at 809 (citing *In re Deihl,* 80 B.R. 1, 2 (Bankr.Me.1987)). The majority rule denies compensation relating to dischargeability issues since such services do not actually benefit the estate. *Murray,* 132 B.R. at 809 (citing *In re Reed,* 890 F.2d 104 (8th Cir. 1989)).

In the instant case no dischargeability issue exists, and thus *Murray* is of no aid to the Applicant. Neither are these circumstances "peculiar" enough to prevent the Court from severing fees for services rendered to the Debtor individually which were of no benefit, and indeed which were directly against the interests of, the estate.

This Court's rule has consistently been as set forth in *In re Copper King Inn*, 6 Mont. B.R. 255, 258 (Bankr.Mont.1988), that where the activities of a debtor's counsel best served the debtor's principals, it presented a conflict of interest problem in violation of 11 U.S.C. § 327, subjecting counsel's fees to a reduction. *Id.*, citing *In re Kendavis Industries International, Inc.*, 91 B.R. 742 (Bankr. N.D.Tex.1988); *In re By–Rite Oil Co.*, 87 B.R. 905 (Bankr.E.D.Mich.1988). This rule is consistent with that cited above in *Granite Sheet.*

Accordingly, even if this Court had not disallowed all further compensation to Applicant for failure of the Rule 2014 duty to disclose the Ingalls representation, the Court would disallow fees rendered for the benefit of John Love personally rather than for the benefit of the estate. Such services include the DIP's resistance to the UCC's attempt to disgorge John Love's unauthorized draws. The UCC attempted to recover those draws for the estate. The DIP resisted successfully. There the estate's interest was directly adversarial to the DIP's personal interest, and the estate should not be responsible for the DIP's personal legal fees.

The DIP's personal interests also diverged from those of the estate, at least partially, where Applicant represented the DIP in settling estate claims against the Debtor's spouse, J.B. Love, First Interstate Bank, and First State Bank of Shelby. At least a proportion of those legal fees would be disallowed from Applicant's fee request.

**D. U.S. Trustee Objections.**

■ The U.S. Trustee objected to Applicant's fee application on the grounds the entries were vague, with inadequate detail supporting the use of FAX and express mail, and excessive time charged for the preparation of the fee application. Applicant responded that the fee application services were provided solely as a function of this Court's earlier Order requiring supporting detail, citing *In re Nucorp Energy, Inc.*, 764 F.2d 655 (9th Cir.1985).

In *Nucorp* the 9th Circuit held that work preparing fee applications is compensable. *Id.* at 662. The fee applications in *Nucorp* involved more than 200 hours at $18,750 of professional and paraprofessional time to prepare and present fee applications. *Id.* at 657, 659 Ftn. 3. The debtor in *Nucorp* operated throughout the United States with approximately 2,000 employees, with assets and liabilities totalling hundreds of millions of dollars and several outstanding issuances of public debt and securities, and continued to operate in Chapter 11. *Id.* at 656–7. Forty attorneys and paralegals worked on the *Nucorp* bankruptcy for that debtor. *Id.* at 659.

In contrast, the instant case involves a liquidating pre-packaged bankruptcy of a DIP with at most two employees. Despite being much less complicated than *Nucorp*, and despite the fact that this Court provides a form in the local rules for fee applications, Applicant spent approximately 192 hours to prepare a fee application, almost as much as was spent preparing the fee application in *Nucorp*.

■ Applicant is correct that Applicant is entitled to reasonable fees and costs for preparation of detailed fee applications. *Nucorp, supra.* However, the operative word is "reasonable". As one case cited by Applicant states:

> We agree with the reasoning of *Nucorp* and hold that attorneys are entitled to reasonable compensation for efforts expended to prepare and present fee applications to the extent that they represent an additional burden imposed on the professionals by the Code. Only the time expended to sustain that additional burden should be allowed. *In re WHET, Inc.*, 61 B.R. 709, (Bankr.D.Mass.1986).

\*   \*   \*   \*   \*   \*

However, since a detailed billing summary including the same information as required by Bankruptcy Rule 2016 is generally pre-

pared by a professional for a client, those efforts do not represent an additional burden and compensation for them will continue to be disallowed.

*Seneca Oil,* 65 B.R. at 911.

■ In other words, since an attorney must prepare a billing statement for any client, that preparation is not compensable by the estate as is the preparation of a fee application. Usually such fees do not result in very large amounts. Here, however, Applicant requests over $9,300 in fees and costs for preparation of a single interim fee application. The Court rejects Applicant's suggestion that this Court requires such services to satisfy the fee application process, and does not construe *Nucorp* as allowing attorneys a blank check for fee application preparation compensation.

The most glaring example of unreasonable fee application charges is found in Applicant's continued three-tier billing rate. The fee application includes charges at three billing rates, in support of Applicant's request for fee enhancement to $145 or $165 per hour. This Court addressed the "locality rule" limiting attorney fees to $130 per hour in its Order denying Applicant's request for fee enhancement, entered December 2, 1992. Applicant did not seek relief from that Order. Neither did Applicant appeal that Order. The Bankruptcy Appellate Panel ("BAP") of the Ninth Circuit affirmed this Court's locality rule in a later case. *In re Bob's Supermarkets, Inc.,* 12 Mont.B.R. 114, 122 (9th Cir.BAP 1992).

With the Applicant having failed to seek relief from the locality rule in this Court's earlier Order, and the BAP's subsequent affirmation of the locality rule, the Court is at a loss to understand why Applicant proceeded to clutter up the instant fee application with three billing rates. Applicant accuses the U.S. Trustee and UCC with inability to read a "thorough" fee application. On the contrary, the Court finds Applicant's unwarranted three-tier billing, and the time spent incorporating it into the fee application, unreasonable and noncompensable.

There are other charges in the fee application which may be unreasonable or not necessary to the estate, but with all compensation disallowed it is not necessary to engage in further detailed review.

### E. Conclusion.

In conclusion, for Applicant's failure to disclose Applicant's law firm's representation of Dave Ingalls, for the extreme degree which Applicant's fee and cost requests exceed Applicant's estimates, and for the fact that a substantial portion of Applicant's services were rendered for the benefit of the DIP personally or the DIP's family and associates rather than for the benefit of the estate, no further compensation or reimbursement for costs will be allowed to Applicant.

IT IS ORDERED the U.S. Trustee's and UCC's objections to Applicant's Second Attorney Fee Application in the sum of $71,-377.50 and costs of $19,833.54 are sustained, and the application is denied.