**In re JORE CORPORATION, a.k.a. JB Tool, LLC, a.k.a. Jore, Inc., Debtor.**

**No. 01–31609–7.**

United States Bankruptcy Court,
D. Montana.

July 28, 2003.

James A. Bowditch, Boone Karlberg PC, Harold V. Dye, Missoula, MT, Bruce G. MacIntyre, Seattle, WA, for debtor.

Scott H. Clark, Ray, Quinney & Nebeker, Salt Lake City, UT, Kimberly Dynowicz, Haverhill, MA, William Arthur Graham, Graham Law Firm, P.C., Gregory G. Schultz, Petit & Schultz, PLLP, Jon O. Shields, Missoula, MT, Soffer & Rech, New York City, Ward E. Taleff, Great Falls, MT, for creditors.

William L. Courshon, Office of the U.S. Trustee, U.S. Trustee's Office, Seattle, WA, for U.S. Trustee.

Allen J. Guon, Shaw, Gussis, Fishman, Glantz, Wolfson & Tow, Chicago, IL, Joel E. Guthals, Billings, MT, for trustee.

Daniel P. McKay, Office of the U.S. Trustee, U.S. Trustee's Office, Great Falls, MT, for U.S. Trustee.

### MEMORANDUM OF DECISION

RALPH B. KIRSCHER, Bankruptcy Judge.

In this Chapter 7 case, which was converted from Chapter 11 upon the Debtor's motion by Order entered September 4, 2002, after due notice a hearing was held at Missoula on May 8–9, 2003, on the U.S. Trustee's "Motion to Disqualify Perkins Coie, Vacate Employment Order, and Disgorge and Disallow Fees" (hereinafter the "U.S. Trustee's Motion"). Perkins Coie LLP ("Perkins"), attorneys for the Debtor, filed an objection and was represented at the hearing in opposition by attorney Theodore Collins ("Collins"). The United States Trustee Diane E. Tebelius ("Tebelius") appeared in support of the U.S. Trustee's Motion, along with attorneys William L. Courshon ("Courshon") and Daniel P. McKay ("McKay"). Testimony of witnesses was heard and exhibits were admitted, and at the conclusion of the hearing the Court granted the parties time to file briefs, after which this matter would be deemed under advisement. Perkins filed its post-hearing brief on July 1, 2003, which has been reviewed by the Court together with the U.S. Trustee's post-hearing brief and the record. This matter is ready for decision. For the reasons set forth below, the U.S. Trustee's Motion will be granted by separate Order and Judgment, Perkins will be disqualified from its employment by the Debtor and the Order authorizing the Debtor to employ Perkins as its attorney will be vacated, and Perkins will be ordered to disgorge all compensation, fees and costs received from the Debtor during the course of this proceeding under Title 11, U.S.C., except as hereinafter provided for approved costs and expenses incurred in complying with the Case Management Order issued by this Court.

This Court has original and exclusive jurisdiction of this bankruptcy case pursuant to 28 U.S.C. § 1334(a). The U.S. Trustee's Motion is a core proceeding under 28 U.S.C. § 157(b)(2) involving Perkins Coie's employment and applications for professional compensation from the estate as an administrative expense. This memorandum includes the Court's findings of fact and conclusions of law under F.R.B.P. 7052 and 9014.

### TRIAL PROCEEDINGS

Perkins Coie attorney Bruce G. MacIntyre ("MacIntyre") and Alan D. Smith ("Smith") testified, as did attorney Peter Richard Jarvis ("Jarvis"), who the parties stipulated is an expert in attorney professional responsibility. Attorneys Joel P. Guthals ("Guthals"), Harold V. Dye ("Dye"), and Jerome Shulkin ("Shulkin") each testified as experts on bankruptcy law and the practice in this Court for disclosure of conflicts of interest under F.R.B.P.2014(a). Attorney Bruce Fain ("Fain") testified as a fact witness, as did Debtor's controller Kelly Grove ("Grove"), and Debtor's consultant and turnaround

specialist Clyde Hamstreet ("Hamstreet"). Exhibits ("Ex.") 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 (also designated "revised Ex. C" to Jarvis's declaration), 17, 18, 19, 20, 21 were admitted into evidence. Also admitted were the transcript of the deposition of expert David Boerner ("Boerner")—Ex. B; an Affidavit ("Aff.") of Gerald McConnell ("McConnell")—Ex. C, and a Rule 2004 examination transcript of McConnell—Ex. D. The Court took judicial notice of Guthals' affidavit (Ex. C attached to docket # 1202). At the close of Perkins Coie's case in chief the Court closed the record, granted the U.S. Trustee 15 days to file its brief, and granted Perkins Coie 15 days thereafter to file its brief.

### FACTS

This case commenced on May 22, 2001, when Jore Corporation (hereinafter "Jore" or "Debtor") filed its Chapter 11 petition. Jore was in the business of manufacturing and selling power tool drill bits and accessories to retailers. Grove testified that Jore had missed its sales plan for the year 2000 by a significant amount, and in 2001 faced a significant shortfall in cash. Transcript ("Tr.") Grove, pp. 4–5. Jore's loans from Wells Fargo were turned over to the workout group, and Jore attempted to restructure its financing with Wells Fargo's asset-based lender. However, an appraisal of Jore's assets came back much lower than anticipated, and Jore's auditor required a writedown for overvalued inventory of more than $5 million. Tr. Grove, p.

7; Tr. Hamstreet, pp. 9–10; Ex. C, McConnell Aff., p. 7. Jore had no free and clear assets. Tr. Grove, p. 9.

Turnaround professionals were brought in at Wells Fargo's urging, but Jore was unable to avoid bankruptcy. Tr. Grove, p. 20; Ex. D, McConnell, pp. 71–72. Hamstreet was hired by Jore's board of directors before the bankruptcy to oversee the bankruptcy and restructuring, and find a buyer. Tr. Hamstreet, pp. 6–7. He testified that his first conversation with Wells Fargo after being hired involved the risk of missing payroll or bouncing checks, and that Wells Fargo was hesitant to loan Jore any more money. Tr. Hamstreet, pp. 8–9. McConnell was also hired a few weeks before the bankruptcy. Tr. Hamstreet, p. 12. Hamstreet testified that he knew right after being hired that Jore needed to file bankruptcy and restructure. Tr. Hamstreet, p. 11. However, the board of directors, including Matt Jore and Mike Jore, were insistent that they would not file bankruptcy or talk to the banks about bankruptcy and that if Hamstreet tried to bring up bankruptcy he would be fired. Tr. Hamstreet, pp. 11–12. This hesitancy resulted in what Hamstreet testified was a lost opportunity[1]. Tr. Hamstreet, p. 12.

### I. Perkins' Employment.

Perkins was selected as Jore's bankruptcy counsel by Jore's in-house counsel Dave Bjornson, with Hamstreet's recommendation. Tr. Hamstreet, pp. 18–19; Ex. D,

---

1. Hamstreet testified:
"[W]e lost an opportunity there, in that if you have enough time, you are in a better position to put your ducks in a row and get your counsel up to speed and negotiate.
But in this case we got a couple overadvances, and you know, the banks got a little latitude, but we already used that up and started bouncing payroll checks; there wasn't anything left.

So by the time we had to file bankruptcy, once the Jores finally realized it was over with, why by that time the board had an election and they know they were going to be removed unless they resigned so they resigned. And that's when the board appointed Jerry McConnell and myself." Tr. Hamstreet, p. 12.

McConnell, pp. 124–25; Tr. Smith, p. 6. Smith testified that before agreeing to represent Jore, Perkins conducted a conflicts check, and he recognized immediately that Perkins would need a waiver of conflicts from its client Wells Fargo. Tr. Smith, p. 16–17. The Perkins attorney who manages conflicts waivers is Boerner's former student. Ex. B, Boerner Dep., p. 96. MacIntyre became involved in early May of 2001, in early discussions with Wells Fargo. Tr. MacIntyre, p. 8. He made sure the conflicts check was run. Tr. MacIntyre, p. 18.

The Chapter 11 petition was filed on May 22, 2001. The bankruptcy case, as described by Perkins, was "demanding, contentious, and complicated". Perkins' Brief, p. 5; Tr. Smith, p. 34. MacIntyre testified that "from the outset it was clear" that unsecured creditors would not get anything, and that most of the secured debt would not be paid. Tr. MacIntyre, p. 74.

Perkins submitted an affidavit of MacIntyre in support of its application for employment as Debtor's bankruptcy counsel on May 22, 2001. Ex. 18. Ex. 18 identifies MacIntyre and Smith as Perkins' attorneys primarily responsible for representing the Debtor. MacIntyre states on Ex. 18: "I have undertaken an investigation of any connections that may exist between Perkins Coie and the Debtor, the creditors of the Debtor or any other party in interest . . . . To the best of my knowledge, I and Perkins Coie have no such connections and are 'disinterested persons' as defined in 11 U.S.C. § 101(14), except as stated in this Affidavit." Ex. 18, p. 2. Ex. 18 lists 19 creditors which were current clients of Perkins on unrelated matters, and 17 creditors which were former clients[2]. Ex. 18 then states: "Perkins

Coie currently represents Wells Fargo Bank, the parent corporation of First Security Bank N.A., Debtor's primary prepetition lender and one of the proposed DIP lender[s] herein. All of Perkins Coie's past and present representation of Wells Fargo have been in matters unrelated to this Debtor." MacIntyre testified that he knew at that early stage, before the Chapter 11 case was filed, that "Wells Fargo was the company's primary prepetition lender", the only potential DIP lender, and that Wells Fargo would play a significant role in the case. Tr. MacIntyre, pp. 21, 42.

Ex. 18 states at page 4, subpart 2(f): "This Declaration includes all issues and parties in interest that I have identified at the present time. *Perkins Coie continues to review its connections* with shareholders, creditors, potential creditors and other parties in interest in this Chapter 11 case. *Perkins Coie will notify the Court if any actual conflicts of interest or other significant connections are discovered in this process.*" (Emphasis added).

Addressing what it admits in its brief was a "significant potential for a conflict with one or more past or present clients", MacIntyre describes a "fallback" arrangement in Ex. 18, p. 4, paragraph 3:

The Debtor has agreed that in the event Perkins Coie has an actual unwaived conflict of interest with any party adverse to the Debtor herein, Perkins Coie will not represent either the Debtor or the adverse party for such matters. If an actual conflict of interest arises herein, Debtor will (i) request Perkins to obtain the necessary and appropriate waivers; (ii) apply to employ special counsel to the Debtor if required by the nature of such matters; or (iii) use

**2.** MacIntyre testified the total number of current or former Perkins' clients which showed up on the conflicts check was close to 90. Tr. MacIntyre, p. 70.

Jore's local counsel, Harold V. Dye or Jore's in-house counsel, David Bjornson, to represent Debtor in those matters. McConnell testified that he was taught to make arrangements to handle unwaived conflicts in the above manner. Tr. MacIntyre, p. 22. He testified that Perkins and the Debtor agreed to this fallback plan in the event of unwaived conflicts, and he interpreted the Court and parties to have approved of the fallback plan since no one objected. Tr. MacIntyre, p. 56.

On June 4, 2001, Smith[3] wrote a letter to Scott L. Manookin ("Manookin"), Wells Fargo's vice president, regarding "Simultaneous Representation of Wells Fargo Bank and Jore Corporation". Ex. 1. In Ex. 1 Smith confirms that Perkins "has received the informed consent of Wells Fargo Bank ("Wells") to undertake the representation of Jore Corporation ("Jore") on a matter in which the interests of Jore and Wells are adverse, while continuing our representation of Wells on unrelated matters." Smith admits that "[c]ertain aspects of the Chapter 11 bankruptcy proceedings are adverse to Wells, including without limitation real estate, employment, litigation and unrelated bankruptcy matters . . . ." Smith then discusses the rules of professional responsibility and conflicts of interest and the conditions required for Perkins to represent Jore on matters adverse to Wells Fargo, while representing Wells Fargo in separate, unrelated matters. Smith asks for Wells Fargo's consent, after stating:

"We have agreed that we will not represent Jore in litigation directly adverse to Wells, or in any matter involving the assertion against Wells of a claim of fraud, misrepresentation, or other dishonest conduct, and are confirming that understanding with Jore in writing.

Please confirm that Wells consents to the foregoing on an informed basis after full disclosure and with the recognition that the Firm's representation of Jore on a matter adverse to Wells, and simultaneous representation of Wells on an unrelated matter *creates a conflict of interest.*"

Ex. 1 (emphasis added). Manookin signed Ex. 1 for Wells Fargo[4], consenting to Perkins' representation of Jore, but the parties later disagreed on what it meant.

Smith testified that the above language was drafted by Perkins' conflicts department, and included the "no litigation" language that had been used with other standard conflicts waivers with Wells Fargo. Tr. Smith, pp. 20–21, 31, 78. Smith testified that he was almost positive that no discussion or negotiations occurred between Perkins' conflicts department and Wells Fargo about the meaning of the no litigation language in Ex. 1. Tr. Smith, p. 78. MacIntyre testified that no litigation clauses in waivers come from more sophisticated parties such as banks and lenders. Tr. MacIntyre, p. 26. He did not see the limitations on Wells Fargo's waiver as significant to his representation of Jore, and did not recall even focusing on that language because he had come to expect it as a standard part of a waiver letter, and because Jore had waived its claims and defenses against Wells Fargo and Perkins had reviewed Wells Fargo's security interests and concluded they were perfected. Tr. MacIntyre, pp. 28–29.

---

**3.** MacIntyre testified that Smith signed Ex. 1 because he has been employed by Perkins longer than MacIntyre, and it "felt more natural" for Smith to talk to Wells Fargo and obtain the waivers. Tr. MacIntyre, p. 25.

**4.** Perkins received Ex. 1 back from Manookin most likely June 18, 2001. Tr. Smith, p. 107.

Smith testified that in bankruptcy "there's a lot of things that go on that are adverse but aren't, you know, litigation within the meaning of something like this." Tr. Smith, pp. 20–21, 92. He testified that he acknowledged that there was a grey area, but that neither side interpreted "litigation" as encompassing everything adverse in front of a judge because then a waiver would be totally meaningless in a bankruptcy case. Tr. Smith, pp. 32, 80. Smith felt that the no litigation exception to Wells Fargo's conflicts waiver would not encompass the scope and meaning of the DIP financing order or cash collateral, because Perkins had represented the client in those negotiations and should be able to continue its representation to resolve disputes involving those matters. Tr. Smith, pp. 32, 96–97. MacIntyre testified that the nature of Wells Fargo's waiver, with the no litigation exception, did not change his conduct of the case in any way: "It never even crossed my mind. No one ever raised it to me. There was just never a thought that that would impact in any way the manner in which we conducted the case." Tr. MacIntyre, p. 43.

Smith sent letters similar to Ex. 1 dated June 4, 2001, to Jore's president and CEO McConnell (Ex. 10), and to General Electric Capital Corporation ("GECC") (Ex. 9) addressing the conflicts of interest which Smith stated were created by Perkins' representation of Jore and other clients. Ex. 9 differs from Ex. 1, in that in Ex. 9 Perkins does not agree that it will not represent Jore in litigation directly adverse to GECC, as Perkins agreed in Ex.

1. Rather, Perkins agrees in Ex. 9 that it "may not undertake any representation involving the assertion against GECC of a claim of fraud, misrepresentation, or other dishonest conduct." [5]

In Ex. 10 Smith explains to McConnell Perkins' representation of Wells Fargo and GECC [6] while representing Jore on matters adverse to those clients. Smith explains that Perkins "may not undertake any representation involving the assertion against either [Wells Fargo & GECC] of a claim of fraud, misrepresentation, or other dishonest conduct, or any representation in litigation directly adverse to Wells." Ex. 10. Smith asks Jore to recognize that Perkins' representation of Jore in matters adverse to Wells Fargo and GECC "creates a conflict of interest", and to consent to Perkins' representation. Ex. 10 states: "Wells' consent does not extend to Perkins Coie's representation of Jore in litigation directly adverse to Wells." McConnell signed Ex. 10 and consented [7]. Ex. C, McConnell Aff., p. 5.

After Smith sent Manookin Ex. 1 dated June 4, 2001, MacIntyre filed a "Supplemental Declaration" on June 6, 2001, Ex. 19, in support of Perkins' employment application, reaffirming and supplementing Ex. 18. MacIntyre in Ex. 19 describes Perkins' "ongoing investigation of any connections" with the Debtor, creditors and other parties, lists several more current or former clients which are creditors of Jore, and lists other connections between Perkins and Jore and its insiders. Ex. 19

---

5. Perkins does agree that its personnel providing services to Jore in matters adverse to GECC will not be among those concurrently providing services to GECC.

6. GECC had the potential to be a DIP lender or somehow fund a buyout early in the case, but those hopes faded. Tr. MacIntyre, pp. 30–31.

7. Ex. 11 and 12 are letters from Perkins to McConnell and Northwest Capital Appreciation, Inc. ("NCAI") addressing similar conflict of interest issues and McConnell's consent.

names 21 additional current clients of Perkins, on unrelated matters, which were creditors of the Debtor, and 32 former clients[8]. At paragraph 2(b), MacIntyre discusses Perkins' past and present representation of Wells Fargo in matters unrelated to the Debtor, and states that due to Wells Fargo's role as primary pre-petition lender and proposed DIP lender, "Perkins Coie has received oral waivers from both Wells Fargo and Jore, and is in the process of obtaining written waivers from both parties." Ex. 19, p. 2; Tr. Smith, p. 103. At page 5, paragraph 6 of Ex. 19 MacIntyre states, in identical language to Ex. 18, paragraph 2(f), that "Perkins Coie continues to review its connections with shareholders, creditors, potential creditors and other parties in interest in this Chapter 11 case. *Perkins Coie will notify the Court if any actual conflicts of interest or other significant connections are discovered in this process.*" (Emphasis added). MacIntyre concludes Ex. 19 by stating that nothing disclosed therein should disqualify Perkins from vigorous and unfettered representation of the Debtor's interests, and that the Debtor agrees that in the event Perkins Coie has an actual unwaived conflict of interest with any party adverse to the Debtor or if an actual conflict of interest arises, Perkins will obtain waivers or the matter would be handled by in-house or local counsel. Ex. 19, page 5, paragraph 7.

Ex. 19 is dated after Ex. 1, but MacIntyre did not file anything with the Court disclosing the no litigation exception to Wells Fargo's conflicts waiver of Ex. 1, either in Ex. 19 or afterward. Tr. MacIntyre, pp. 55, 57. MacIntyre testified that the issue of whether to disclose the nature of Wells Fargo's waiver was never raised, never considered, and never decided, so there was no conscious decision to not disclose the no litigation limitation of Wells Fargo's conflicts waiver. Tr. MacIntyre, pp. 58–59. MacIntyre did disclose in Ex. 19 that a Perkins employee is a cousin of two of the Debtor's insiders; that another Perkins employee at one time traded in Jore's stock; and that MacIntyre's cousin Chuck works for the Clerk of the U.S. District Court for the District of Montana in Butte. Ex. 19, p. 4; Tr. MacIntyre, p. 58.

Under direct examination by Perkins' trial counsel about the no litigation exception, Smith testified, "I honestly don't remember thinking about it in order to think whether it should or should not be disclosed because it did not—it just didn't appear to me to be an important issue at the time. We just—we didn't have those claims, we couldn't prosecute them if we had them under the DIP order, and it just wasn't something that even struck me as— I don't even remember thinking about it." Tr. Smith, pp. 27–28. Under cross examination, Smith repeated his 2004 examination answer that the only way the Court or the U.S. Trustee would know that Wells Fargo's conflicts waiver was anything less than full or total was: "I'm not sure how anyone would do that other than asking us." Tr. Smith, p. 82[9]. Smith testified regarding Perkins' obligations to disclose connections with creditors: "I'm not sure that existence or non-existence of a letter is a connection in terms of a separate

---

**8.** In all, Perkins states that it identified Wells Fargo and 89 other current or former clients that presented potential conflict issues. Perkins' Brief, p. 6.

**9.** The next question put to Smith was: "Is that the Court's burden?"; to which Smith replied: "It calls for a legal conclusion, it's argumentative. I don't have to wait for my lawyer to give the legal objection. Neal, if you want to argue your case, please argue your case in front of the Judge, not in front of me." Tr. Smith pp. 82–83.

connection that has to be disclosed, other than—the new relationship certainly is a connection that has to be disclosed. I certainly don't dispute that, and that was disclosed. I'm not sure that every letter or every other aspect is a separate connection that then has to be disclosed." Tr. Smith, p. 104. Perkins did not disclose the waiver of conflicts by GECC. Tr. Smith, p. 105; Tr. MacIntyre, p. 55. In fact, Smith testified he was not aware that Perkins ever received the waiver of conflicts from GECC in response to Ex. 9. Tr. Smith, pp. 25–26.

After a hearing, the Court granted final approval of Perkins' employment by the Debtor by Order entered June 28, 2001 [10]. Perkins' employment application filed May 22, 2001, provides at page 6, paragraph 7(f) that the Debtor proposes to pay Perkins Coie monthly eighty percent (80%) of its monthly fees incurred, plus 100% of its disbursements and expenses, with the remaining 20% paid upon the Court's final approval of its application for compensation.

MacIntyre filed a further Supplemental Declaration in support of Perkins' employment application on August 15, 2001, Ex. 20. Ex. 20 reaffirms and supplements Ex. 18 and 19, revealing as a result of its "ongoing monitoring of any connections that may exist between Perkins Coie and the Debtors, the creditors ... an additional connection" in the form of a client and potential purchaser [11] of substantially all of the Debtor's assets. Paragraph 5 of Ex. 20 states, similarly to Ex. 19 and 20:

> This Declaration discloses all additional issues and potential conflicts of interest that have been identified at the present time. Perkins Coie continues to review

and monitor its connections with shareholders, creditors, potential creditors and other parties in interest in this Chapter 11 case. Perkins Coie will notify the Court if any actual conflicts of interest or other significant connections are discovered in this process.

Actual conflicts arose between Wells Fargo and Perkins, but Perkins failed to disclose them. MacIntyre testified that Ex. 1 was not brought to the Court's attention until the issue came up in a Status Report. Tr. MacIntyre, p. 57.

## II. DIP Financing & Use of Cash Collateral.

Even before the case commenced Jore's professionals recognized its need for debtor-in-possession ("DIP") financing. Tr. Hamstreet, pp. 10–11; Tr. Smith, p. 10; Tr. MacIntyre, pp. 8–9. Hamstreet and MacIntyre negotiated for DIP financing with Wells Fargo and its co-lender Harris Trust and Savings Bank ("Harris"). Tr. Hamstreet, pp. 12–13; Tr. MacIntyre, pp. 10–11. Jore needed DIP financing in order to acquire materials to manufacture inventory for sale during its peak season, in order to demonstrate to its suppliers and customers that it had adequate financing to operate and preserve the company for sale to a buyer. Tr. Hamstreet, pp. 14–15; Tr. Smith, p. 15. Hamstreet recognized that there was not enough equity to reorganize the company, and that "the only salvation for Jore was to find a buyer". Tr. Hamstreet, p. 14. McConnell, MacIntyre and Smith each testified that without a DIP financing order, Jore would not have stayed in business. Ex. D, Tr. McConnell, p. 67; Tr. MacIntyre, p. 17; Tr. Smith, p. 12. Interim post-petition financing and limited use of cash collateral

---

**10.** Perkins' employment had been conditionally approved by Order entered May 22, 2001.

**11.** The client is Northwest Capital Appreciation, Inc. ("NCAI"), which did not in the end purchase the Debtor's assets.

was authorized by the Court effective on the petition date, and it continued until a final hearing.

On May 24, 2001, Jore and Wells Fargo, for itself and Harris, filed a 31–page (excluding exhibits) stipulation providing for interim DIP financing, signed by MacIntyre for the Debtor and by attorney Gregory G. Schultz for Wells Fargo and Harris. That stipulation provided for, among other things, interim postpetition financing and use of cash collateral by the Debtor, and for senior liens and priority administrative expenses in favor of Wells Fargo with an exception for a "professional fee carve-out" ("carve-out") for professionals of the Debtor, trustee or official, committee not to exceed a total of $585,000. In addition, the stipulation provides for the Debtor's waiver of any surcharge claims against the lenders under 11 U.S.C. § 506(c), and in addition the Debtor waived any defenses, claims or counterclaims against the claims of the lenders. Tr. Smith, pp. 101–02; Tr. MacIntyre, pp. 14–15, 17; Ex. C, McConnell Aff., p. 9. Hamstreet testified that he had never seen a DIP financing loan in which a lender did not require a debtor's waiver of claims against the bank "to clean the slate"[12]. Tr. Hamstreet, pp. 13–14. Smith testified that such a waiver of claims against a DIP lender is "more than standard". Tr. Smith, p. 12. Fain, who represented equipment lenders[13] and had objected, testified that he and his clients "felt like, essentially, the store had been given away to the lender". Tr. Fain, pp. 5, 23. Notwithstanding the Debtor's waiver of claims against Wells Fargo, the unsecured

creditors' committee would have the right to examine such claims. Tr. Smith, p. 13; Tr. MacIntyre, pp. 14–15.

After a hearing held on June 28, 2001, the Court entered a Final DIP Financing Order on June 29, 2001. The Final DIP Financing Order includes Debtor's waiver of claims against Wells Fargo and Harris, and the carve-out provision for professional fees from the DIP financing stipulation. The DIP Order also required the Debtor to propose a Plan to which Wells Fargo would not object. Tr. Smith, pp. 39–40, 42. Armed with the Final DIP Financing Order, Jore proceeded to attempt to find a buyer for its assets.

On July 5, 2001, the Court entered a "Case Management Order" because of the number of creditors and to minimize the expense and delay. The Case Management Order made the moving party responsible for providing notice and service of any hearing and motion to all parties listed on the special mailing matrix. It also made Debtor's counsel Perkins responsible for serving orders entered by the Court, and for processing and maintaining claims and interests registers, thereby relieving the Clerk of Court of a large part of the burden and expense incurred in this case.

Perkins filed its First Interim Application for fees and costs on November 21, 2001, requesting interim fees in the amount of $780,423,45 and costs in the amount of $103,023.12. Perkins' Brief states that it has applied for reimbursement of $215,765.77 in expenses and has received $161,571.82, but no evidence ex-

---

**12.** Hamstreet was not familiar with restrictions against waiver of claims against a lender in DIP financing and cash collateral stipulations established in the United States Bankruptcy Court for the Western District of Washington, Ex. 15 ("General Order No. 2"— "Guidelines for Cash Collateral and Financing Stipulations"). Tr. Hamstreet, pp. 28–30.

The General Order from the Western District of Washington, Ex. 15, does not apply in this Court.

**13.** Fain replaced Guthals as attorney for secured creditor American Equipment Leasing. Ex. A, Guthals Affidavit.

ists in the record showing how much of those expenses were incurred by Perkins in complying with the Case Management Order. Neither is there any way for the Court to reliably estimate that proportion of expenses from the total expenses included in Perkins' three fee applications.

### III. Proceedings Through Sale of Debtor's Assets.

Notwithstanding the Final DIP Financing Order, the Debtor and Wells Fargo continued difficult negotiations regarding the banks' treatment in a sale of the business. Hamstreet testified that one of his meetings with the banks was one of the most unpleasant meetings he ever had with a bank. Tr. Hamstreet, pp. 16–18. MacIntyre testified that the case "had a lot of shifting alliances throughout the case." Tr. MacIntyre, p. 32. McConnell testified that Harris would routinely renege on commitments made by Wells Fargo with respect to the DIP Financing Order, its interpretation and extension. Ex. D, McConnell, pp. 63–65; Tr. MacIntyre, p. 33. The situation became progressively worse, and the conflict between Wells Fargo and Perkins erupted in court in December of 2001.

The proposed sale to a "financial buyer"[14] identified as "NCA" had fallen through when NCA withdrew its offer. Tr. Smith p. 74; Tr. MacIntyre, p. 32. A "strategic buyer", Pentair, Inc. ("Pentair"), expressed some interest, but ultimately withdrew its first offer in February of 2002[15].

On December 19, 2001, the Court heard on shortened notice the Debtor's motion to extend and amend the terms of the Final DIP Financing Order, and Debtor's alternative emergency motion for use of Wells Fargo's cash collateral. Smith testified that the hearing was quite contentious, and that the Debtor's use of cash collateral was "absolutely critical to the case going forward." Tr. Smith, p. 93. This Court noted in its Order entered December 21, 2001, that counsel for Wells Fargo appeared at the hearing and "strongly opposed" Debtor's request for use of cash collateral, complaining of a flawed business model and $3 million in various professional fees incurred by the Debtor. Despite Perkins' agreement in Ex. 1 that it would not represent Jore in litigation directly adverse to Wells, MacIntyre appeared at the contested hearing representing Jore. Wells Fargo did not raise the issue of the "no litigation" exception to its conflicts waiver at the time, but was under no obligation to raise it although it had the right. Tr. Smith, pp. 93–94, 95–96, 98–99; Ex. B, Boerner, p. 65.

The Court granted Jore's emergency motion for use of cash collateral, finding that the DIP Finance Order expired on December 28, 2001, and that if not extended Jore would be forced to immediately cease operations. The Court authorized Jore to use cash collateral through January 12, 2002.

Wells Fargo appealed and filed a motion to modify stay, as did other creditors. The motions to modify stay were settled, and on January 31, 2002, the Court en-

---

**14.** A "financial buyer" is a buyer that is not in the business of the prospective seller, or "target"; while a "strategic buyer" is in the same or a closely-related business and therefore more familiar with the business and how to integrate it into its own business. Tr. Smith, p. 45.

**15.** MacIntyre testified that Hamstreet valued the company at $80 million prior to the September 11 terrorist attack, but that the resulting economic downturn changed the way companies such as the Debtor were valued to the point where Pentair's first offer was for $40 million. Tr. MacIntyre, pp. 60–61. Pentair's second offer was $26 million cash. Tr. MacIntyre, pp. 61–62.

tered Orders incorporating the Debtor's third amended budget into the Final DIP Financing Order, and setting a deadline for establishing the first procedures for approval of the sale of substantially all of the Debtor's assets to Pentair. On February 4, 2002, Debtor filed a Disclosure Statement and two Chapter 11 Plans. The Disclosure Statement was approved, but that approval was later vacated on February 11, 2002, as was the approval of the bid procedures vacated by Order entered February 12, 2002, and the Debtor was directed to file an amended Disclosure Statement and Plan.

On February 25, 2002, the Debtor filed a report stating it was unable to file a revised Plan and Disclosure Statement. Motions to convert the case to Chapter 7 or appointment of a Chapter 11 trustee followed shortly, filed by creditors. Wells Fargo objected to conversion, but moved for appointment of a Chapter 11 trustee on March 1, 2002, for which a hearing was set for April 2, 2002 [16]. On March 29, 2002, the Debtor filed motions to establish bid procedures and approve overbid minimums, and for sale of substantially all of the Debtor's assets, which were set for hearing on April 15, 2002. Wells Fargo, GECC and other secured creditors were authorized by the Court's Order entered April 2, 2002, to submit their own proposed bidding and sale procedures by April 4, 2002. Both the creditors and the Debtor filed proposed bid and sale procedures, and on April 5, 2002, the Court entered an Order establishing the bidding procedures and reserve prices of secured creditors to govern the hearing on the motion for sale on April 15, 2002. The Debtor's motion for sale, and Pentair, requested that the secured creditors not be allowed to credit bid, but the Court allowed credit bidding by the secured creditors. Tr. Fain, pp. 34, 38; Tr. MacIntyre, pp. 62–63. MacIntyre testified that Perkins argued adversely against Wells Fargo with respect to the proposed "break up" fee [17]. Tr. MacIntyre, p. 34.

The Debtor, Wells Fargo and Harris filed another stipulation on April 12, 2002, to extend DIP financing through the sale, which was approved. However, relations between their professionals had continued to sour. MacIntyre testified that from December of 2002 and the sale in April, the Debtor's professionals agreed that their fees were at risk. Tr. MacIntyre, pp. 40–41. The night before the April 15, 2002, sale hearing, an issue of contention arose out of the "carve-out" for the Debtor's professional fees which had been a component of the Final DIP Financing Order. MacIntyre testified that at a dinner meeting in Missoula that night attended by himself, McConnell, Hamstreet, and representatives for Pentair and Wells Fargo: "[W]e were talking about the structure of Pentair's bid to buy the company and the potential that there would be an overbid from Western Mortgage Company's Frank Tiegs. And we were talking about the current amount of unpaid fees .... And I'll never forget: Scott Clark leaned across the table and looked at me. And he said, 'what would you say if the bank took the position that the carve-out was already consumed and there was no more carve-out there?' And he kind of smiled." Tr.

---

**16.** The April 2, 2002, hearings were deemed preliminary hearings for which final hearings were set for April 15, 2002.

**17.** MacIntyre further testified that Perkins was adverse to Wells Fargo with respect to the employment of Glass & Associates, although that was resolved prior to hearing. "So there were a number off [sic] issues, both in court and out of court, where we were adverse, and negotiating, or I suppose you can call it 'litigating', throughout the case." Tr. MacIntyre, p. 34.

MacIntyre, pp. 35–36. MacIntyre testified he answered:

> I looked at him, and pardon my French, but I said, "You son of a bitch. Don't even go there. Just don't even go there."
>
> And he sat back quietly and didn't say a word about it until the next day in the course—and I think it was the next day. I don't think there was a day in between. But during the course of the sale hearing—or the auction hearing, he made it clear that they were not going to honor the carve-out provision in the manner in which we had mutually, I believe, mutually understood it to be interpreted.

Tr. MacIntyre, p. 36.

The sale hearing took place on April 15, 2002, at Missoula. Pentair's bid was not sufficient to meet the secured creditors' release prices, and after negotiations with the creditors Western Mortgage & Realty Company ("Western Mortgage") made a winning bid of $32,949,750, meeting the creditors' release prices. Tr. Fain, pp. 40–45. The Court approved the sale of substantially all of the Debtor's assets to Western Mortgage by Order entered April 17, 2002. All of the proceeds of that sale went to secured creditors, and none went to professional fees. Tr. MacIntyre, pp. 64–65. By that time, MacIntyre testified, 92 or 93 percent of Perkins' hours and fees for work performed for the Debtor had been incurred. Tr. MacIntyre, pp. 43–44. The business assets sold to Western Mortgage remain operating in Ronan, Montana, employing an average of 300 persons full time. Tr. MacIntyre, p. 75.

## IV. Subsequent Proceedings.

On May 2, 2002, Smith wrote Manookin addressing Ex. 1 and certain issues of contention between the parties, i.e., the carve-out for Jore's professionals and whether Debtor's waiver of § 506(c) surcharge claims against Wells Fargo and its equipment lessor affiliate and Harris Bank remained binding. Ex. 2. In Ex. 2 Smith states he recognizes that Wells Fargo and Harris dispute Perkins' contentions, and so requests Wells Fargo to sign and return Ex. 2 and thereby acknowledge that Wells Fargo's existing conflicts waiver of Ex. 1 covers such claims, or that Wells Fargo consents to a further waiver so that Perkins can represent Jore "in all of such matters adverse to Wells Fargo and its affiliates …, while simultaneously representing Wells Fargo and affiliates in other matters." Tr. Smith, p. 31. Smith wanted to clear up any doubt whether a § 506(c) charging order action would be covered by Wells Fargo's waiver. Tr. Smith, pp. 85–86, 99–100. MacIntyre testified that Perkins felt it ought to be able to argue the carve-out issue, which simply involved interpretation of the carve-out language in the DIP Financing Order, before the Court. Tr. MacIntyre, p. 37.

Wells Fargo's attorney Scott Clark ("Clark") replied to Ex. 2 by a letter dated May 9, 2002, Ex. 3, refusing to sign Smith's request for acknowledgment of a waiver of conflicts. Tr. Smith, p. 86. In Ex. 3 Clark states that Ex. 2 "attempts to characterize Wells Fargo Bank's previous waiver of conflicts letter in broad brush terms, Wells Fargo Bank (in your view) having waived any right to object to Perkins Coie acting on behalf of the Debtor in any proceeding directly adverse to the interests of Wells Fargo Bank." Ex. 3. Clark then points out Ex. 1's language, underlining the passage that Perkins "agreed that we will not represent Jore in litigation directly adverse to Wells …." Ex. 3. Clark then states:

> I find your contention that the above numerated claims against Wells Fargo Bank—relating to the "carveout" and

the surcharge under Section 506(c)—
"*... are covered by the earlier letter*"
(i.e. the conflict of interest had been
previously waived by Wells Fargo
Bank), to be incredulous. The reason-
able reading of the words, "*We have
agreed that we will not represent Jore
in litigation directly adverse to Wells,
...*" is that Perkins Coie will not sue
Wells Fargo Bank on behalf of Jore
Corporation. *Period.*

We would invite you to reexamine the
"distinterestedness" of Perkins Coie
when it opposed bidding by Western
Mortgage & Realty and undertook to
thwart the efforts of Western Mortgage
& Realty to acquire the assets of Jore
Corporation. This is clearly a case
where the lawyer's economic interests
had become adverse to the interests of
the clients. We would admonish you to
rethink whether or not Perkins Coie
continues to believe that its continued
representation of both Jore Corporation
and Wells Fargo Bank (in other unrelat-
ed matters) will not adversely affect ei-
ther client as required under Rule
1.7(b)(1) of the Rules of Professional
Conduct.

Wells Fargo Bank will not countersign
... [Ex. 2].

Ex. 3, p. 2 (Emphasis in original).

After receiving Ex. 3—Wells Fargo's re-
fusal to acknowledge that its waiver of
Perkins' conflict of interest did not extend
to the carve-out or § 506(c) surcharge—
Perkins did not, notwithstanding MacIn-
tyre's three earlier representations in Ex.
18, 19, and 20 that Perkins "continues to
review its connections" and "will notify the
Court if any actual conflicts of interest or
other significant connections are discover-
ed in this process", disclose to the Court or

the U.S. Trustee the no litigation exception
to Wells Fargo's conflicts waiver, or
GECC's waiver. MacIntyre testified that
the no litigation exception to Wells Fargo's
conflicts waiver was not brought to the
Court's attention until a status report in
April of 2002. Tr. MacIntyre, p. 57.
However, the docket reflects that no Sta-
tus Report was filed during April of 2002.

Smith responded to Ex. 3 by letter dat-
ed May 24, 2002. Ex. 4. Smith acknowl-
edged and recognized that without Wells
Fargo's waiver Perkins was limited in
what it could do. Smith advised Wells
Fargo that Perkins would not represent
Jore in carve-out and § 506(c) "litigation",
but would cooperate with Jore's counsel
(likely Dye) in those efforts and might
indemnify or reimburse Jore's counsel for
expenses. Ex. 4. Clark responded to Ex. 4
on behalf of Wells Fargo by letter dated
May 29, 2002. Ex. 5. After noting that
little remained of the Debtor after the
sale [18] Clark states:

> Your letter [Ex. 4] demonstrates singu-
> lar disregard for the terms and condi-
> tions of the waivers of conflict described
> in the letter of June 4, 2001 [Ex. 1],
> countersigned by Scott Manookin on be-
> half of Wells Fargo Bank. In essence,
> you have indicated that Perkins Coie
> will prosecute claims against Wells Far-
> go using its local proxy, Dye & Moe, and
> will support and indemnify Dye & Moe
> in its efforts. You freely admit that
> Perkins Coie will be the largest benefi-
> ciary of such litigation and will presum-
> ably receive the largest share of the
> proceeds of any recovery. You abandon
> all pretense that the prosecution of this
> litigation against Wells Fargo Bank will

---

**18.** Clark states that the Debtor has no officers
or employees and that Perkins is making the
litigation decisions. However, McConnell
testified that he remains an officer and di-
rector of the Debtor, although all employees
resigned. Ex. D, McConnell, pp. 7–10, 14.

not adversely affect Perkins Coie's relationship with Wells Fargo Bank.

Ex. 5, p. 2.

The dispute was "kicked upstairs [19]". Perkins' managing partner Robert E. Giles ("Giles") wrote to David Garfield ("Garfield") of Wells Fargo's law department a letter dated June 3, 2002. Ex. 6. Giles complains of the "fundamental unfairness" of Wells Fargo's position taken in Ex. 5. Giles asks Garfield to revisit the issues, hoping that Wells Fargo will conclude that Perkins' proposed indemnification and support of Dye in carve-out and § 506(c) surcharge litigation is reasonable, appropriate and ethical. Ex. 6, p. 2. MacIntyre testified that Perkins felt that Wells Fargo, "in our opinion, had precipitated the problem by, we believe, changing their position on the carve-out, the professional fees carve-out at the last minute. My understanding of Mr. Giles' letter is he's saying it's not fair to take a position that creates this problem and then try and exclude us from being about to have the problem resolved in front of the Court that granted the order that we negotiated that is now in dispute." Tr. MacIntyre, pp. 73–74. Giles ends Ex. 6 by expressing that Perkins values its relationship with Wells Fargo "quite highly, and desire that this matter not serve as a barrier to a continued development of that relationship."

Also on June 3, 2002, Perkins filed its Second Application for Compensation requesting fees in the amount of $706,075.35 and costs in the amount of $104,580.97. In the bankruptcy case, on June 14, 2002, the Debtor filed a liquidating Plan and Disclosure Statement, along with a Status Report and the Debtor's Second Supplemental Application to Employ Dye to pursue the carve-out and § 506(c) charging claims against Wells Fargo. In the Second Sup-

plemental Application Dye discloses certain provisions of a conflict waiver between Perkins and Wells Fargo. MacIntyre, in the Status Report filed June 14, 2002, for the first time discloses the limit of Wells Fargo's conflicts waiver, after identifying the carve-out and § 506(c) surcharge as remaining assets:

> One aspect of that litigation is worthy of note. While Perkins Coie does not believe that the contention has merit, it must acknowledge that Wells Fargo Bank, a current client in unrelated matters, contends that Perkins Coie should not prosecute an action against Wells Fargo, whether for surcharge payments or to enforce the carveout provisions of the Final DIP Financing Order. Wells Fargo contends that the conflicts waiver it granted at the outset of the case does not allow Perkins Coie to represent Jore in these matters.

This is the first indication in the record that there were exceptions to Wells Fargo's conflicts waiver. MacIntyre testified: "It was not brought to the Court's attention, and there was no reason that I was aware of at any point during that time that it was worthy of bringing to the Court's attention." Tr. MacIntyre, p. 57. The U.S. Trustee first addresses the issue of the undisclosed conflicts waiver in the response filed by Assistant U.S. Trustee Neal Jensen ("Jensen") to the Second Supplement to Dye's Application for employment, filed June 21, 2002, in which Jensen requests that the Court require Perkins to provide him, the Court, and the parties with additional information related to Wells Fargo's limited waiver of conflicts before approving Dye's employment.

Garfield responded for Wells Fargo to Perkins' Ex. 6 by letter dated June 28, 2002. Ex. 7. Garfield acknowledges to

19. Tr. MacIntyre, p. 69.

Giles that "this disagreement has been emotionally charged and contentious", and then addresses the carve-out language and superpriority treatment of Wells Fargo in the Final DIP Financing Order. Ex. 7. Garfield opines that the language of the Final Order was conclusive and "there is no uncertainty about the meaning", and precluded any further payment to Perkins by Wells Fargo under the carve-out. Ex. 7. Indeed, Ex. 7 notes the possibility that the Court may order disgorgement of fees already paid. Garfield claims that Wells Fargo ultimately lost over $11 million in this case, and describes its response to Giles' accusation of "fundamental unfairness" as "exasperating and, in our opinion, mistaken and uninformed." Ex. 7, p. 6. Garfield complains about the amended Plan submitted by the Debtor which includes recovery from Wells Fargo on the basis of the carve-out and § 506(c) surcharge litigation, which he asserts Perkins is prosecuting "primarily for its own benefit", and concludes Ex. 7 with: "Your response to this letter is important to Wells Fargo and its ongoing relationship with Perkins Coie." Ex. 7, p. 6. Ex. 8 reflects the revenue which MacIntyre states Perkins earned from its relationship with Wells Fargo as $640,000 in 2000, $656,000 in 2001, and $278,000 to July 19, 2002, or between 2/10 and 3/10 of one percent of Perkins' gross income from 2000 to July 19, 2002. Ex. 8, pp. 1–2.

On July 15, 2002, the U.S. Trustee moved for a Rule 2004 examination of Manookin, which was granted. Wells Fargo filed a motion to convert this case to Chapter 7 on July 18, 2002. Perkins sent Jensen Ex. 8, a letter dated July 19, 2002, stating that Jensen had received Ex. 1, the original waiver letter sent by Smith to Manookin with the litigation exception. The U.S. Trustee filed a motion to convert to Chapter 7 on August 2, 2002, but it was deemed withdrawn and instead the U.S. Trustee joined Wells Fargo's motion to convert, which was heard on August 7, 2002, after which the parties were given time to file briefs.

On September 4, 2002, the Debtor filed its own motion to convert to Chapter 7, which was granted and the case was converted to a case under Chapter 7 of the Bankruptcy Code on September 4, 2002. Also on September 4, 2002, Dye filed a complaint against Wells Fargo in Adversary Proceeding No. 02–00102 seeking recovery from Wells Fargo on the basis of the carve-out and § 506(c) surcharge provisions of the Final DIP Financing Order.[20]

A Chapter 7 Trustee was appointed on September 5, 2002, and he filed an application to employ attorneys for the estate, including Guthals, on November 1, 2002, which was granted by Order entered January 24, 2003. Guthals filed an affidavit in support of his employment, Ex. A. In Ex. A Guthals discloses that he formerly represented a secured creditor, American Equipment Leasing, in the Chapter 11 proceedings until he withdrew and was replaced by Fain. Ex. A states Guthals is unaware of any conflict of interest in his representation of the Chapter 7 Trustee, and there appears to be no adverse interest between the Trustee and American Equipment Leasing or its successor Citi-Capital. If any conflict arises, Guthals states that he and his firm will abstain from representing the Trustee with regard

---

**20.** Adversary No. 02–00102 was dismissed without prejudice on June 30, 2003, upon motion of the Chapter 7 Trustee. The Trustee filed a report on May 23, 2003, stating that the probable recoveries in the adversary proceeding did not, in his opinion after investigation, justify the expenditures and that other adversary proceedings would address the Final DIP Financing Order.

to such matter. Ex. A. There is nothing in the record indicating a surcharge or interest adverse between the Trustee and American Equipment Leasing/CitiCapital.

Perkins filed its Third and Final Application for Fees and Costs on February 13, 2003, requesting fees of $132,003.50 and costs in the amount of $8,161.68. In that Application MacIntyre waives all fees and costs incurred by Perkins after the conversion date, September 4, 2002. Perkins' post-hearing brief states that it expended over 7,161 hours of legal time for which it has filed fee applications seeking reimbursement of $215,765.77 in expenses and $1,618,502.30 in fees. The Final Application and Perkins' brief state that Perkins has received $161,571.82 in expenses and $624,617.48 of its requested fees, and recognizes that it has "little likelihood" of actual payment for the balance. Perkins' Brief, p. 5 n. 2.

The U.S. Trustee filed her "Motion to Disqualify Perkins Coie, Vacate Employment Order, and Disgorge and Disallow Fees" on March 5, 2003. After responses were filed, hearing on the matter was continued at Perkins' request until it commenced on May 8, 2003. The Court denied the U.S. Trustee's motion for summary judgment at the commencement of the hearing, and the parties proceeded to put on their cases-in-chief which concluded on May 9, 2003.

### V. Expert Testimony.

Several witnesses testified as experts on applicable Rules of Professional Conduct, and on this Court's standard for requiring disclosure of conflicts and other connections under F.R.B.P. 2014(a).

### 1. Peter Richard Jarvis.

The parties stipulated that Jarvis is an expert in attorney professional responsibility, though not in bankruptcy law. Jore is

a former client of his law firm. He testified that he reviewed Rule 2014 and this Court's case law construing that rule, the Montana Rules of Professional Conduct and ABA Model Rules of Professional Conduct in preparing to testify. Jarvis gave an opinion regarding Perkins' statements to the Court in Ex. 18, 19, and 20 with respect to its professional responsibility and the exceptions to Wells Fargo's conflicts waiver. Jarvis testified that the litigation, fraud and dishonesty exceptions in Ex. 1 were material, and that Perkins' statements made in Ex. 18, 19, and 20 to gain approval of its employment in Jore's Chapter 11 case fall short of Perkins' professional responsibilities of honesty and candor.

Conflicts waiver letters, Jarvis testified, are material and are construed against the attorney. When asked about Smith's opinion that the meaning of the no litigation exception in Ex. 1 was unclear, Jarvis testified that the extent to which the exception language is unclear makes it more important for Perkins to disclose the exception under rules of professional responsibility. Jarvis testified it is not important to disclose the conflicts waiver letters, but that the professional rules requiring honesty and candor require the attorney to disclose the terms of the limitations to a conflicts waiver.

Jarvis testified that Perkins' obligations under the rules of professional conduct are ongoing, and that notwithstanding MacIntyre's statements in Ex. 18 and 19 that all issues have been identified and Perkins will notify the Court if any actual conflicts are discovered, Perkins failed to disclose Wells Fargo's exceptions from its conflicts waiver in Ex. 1. Ex. 20 came after Ex. 1 and its exceptions to conflict waiver were accepted by Wells Fargo, and Jarvis testified that he accepted MacIntyre's representations in Ex. 20 that he undertook an

investigation of Perkins' connections, which bound Perkins to disclose the exceptions of Ex. 1 which Smith knew existed when Ex. 1 was drafted in June of 2001.

Jarvis testified that a client is not required to act in a reasonable manner with respect to conflicts waivers, and that the client is free to withhold consent to a waiver and still enjoy the client's attorney's duty of absolute loyalty. From a professional responsibility standpoint, Jarvis testified that neither the Debtor's waiver of claims against Wells Fargo nor the fallback position change Perkins' ethical obligations to disclose the terms of the limitations of Wells Fargo's conflicts waivers. He testified that the purpose of conflicts waiver letters are to cover what happens if things do not go according to plan, and that there was a foreseeable prospect of litigation between the Debtor and Wells Fargo at the time Wells Fargo was given Ex. 1 by Perkins, which came to pass.

### 2. David Boerner.

Boerner's deposition, Ex. B ("Boerner Dep.") was admitted without objection. The parties stipulated that Boerner is an expert on ethics and attorney conflicts of interest in general, but not as to bankruptcy law. Boerner Dep., pp. 8, 34, 68–69, 80, 87, 113. Boerner gave an opinion that Perkins acted consistently with its ethical obligations in addressing its conflict of interest with Wells Fargo initially and when the actual conflict arose. Boerner Dep., p. 10. Boerner stated that Rule of Professional Conduct 1.8(f) would not require submission of Ex. 1 to the Court, and that the conflicts were disclosed. Boerner Dep., p. 30. Boerner relied on Dye's and Shulkin's opinions as to Perkins' obligation to file Ex. 1 and subsequent correspondence with the Court under Rule 2014(a). Boerner Dep., pp. 32, 34–35. Boerner testified that he did not examine the bankruptcy case law cited by the U.S. Trustee. Boerner Dep., p. 56–57.

Boerner disagreed with Jarvis's opinion that Perkins' failure to disclose the litigation exception to Wells Fargo's conflicts waiver violated Perkins' ethical responsibilities, because Boerner believes that disclosure was not required based on Dye's and Shulkin's opinions, and because of the fallback position where Perkins would step aside and allow Dye to handle litigation against Wells Fargo, and because Jore waived claims against Wells Fargo. Boerner Dep., pp. 36–38, 76–77. Boerner agreed with Jarvis' opinion that the no litigation exception to Wells Fargo's conflicts waiver was Wells Fargo's right, and that it did not have to be reasonable or have reasons for waiving or not. Boerner Dep., p. 65. Under cross examination, Boerner agreed that vague or ambiguous terms in conflicts waiver letters are construed against the drafter. Boerner Dep., p. 62.

Boerner testified that everyone understood that the no litigation clause in Ex. 1 did not include "the normal adversarialness that's inherent in a bankruptcy which some may argue is litigation." Boerner Dep., pp. 71, 98–100, 115. However, he admitted he did not know what litigation or "no litigation" means in a bankruptcy context. Boerner Dep., p. 97. He testified that he did not know what Wells Fargo meant by "litigation", but inferred that Wells Fargo did not view contested matters in the bankruptcy case, such as the contested cash collateral hearing in December of 2001, as litigation because Wells Fargo did not invoke the litigation exception in Ex. 1 at the time. Boerner Dep., pp. 116–17.

### 3. Joel Guthals.

Guthals is employed by the Chapter 7 Trustee. He testified as an expert about

722

his practice in the District of Montana representing Chapter 11 debtors since 1977, his process for checking conflicts of interest regarding other clients, and determining whether client waiver of conflicts is feasible or desirable. Guthals testified that if he discovers a conflict with a client which affects his judgment or ability to represent a debtor-in-possession, he will turn down the engagement with the prospective client. If he determines that a conflict is merely technical or potential, he testified that he would disclose it to the Court in writing.

Guthals has practiced bankruptcy law in this Court for several years. He testified that he is familiar with the concept of limited waivers, and the disclosure of conflicts of interest in employment applications, after reviewing applicable case law. Guthals was asked what he would do if he had a situation where he represented a debtor-in-possession and received a waiver of conflicts from a client which was a creditor that was not unconditional. Guthals testified that, based on the law and practice in Montana as he understands it, he feels he is obligated to disclose a conditional waiver. He testified that if he received a limitation of conflict waiver from a client which was a DIP lender he would have a difficult time showing he was disinterested, and that he would fully disclose the details of the limitation of conflict waiver plus any future developments as a continuing duty to disclose conflict developments exists in Montana. On cross examination Guthals admitted that he has never disclosed conflicts in his initial disclosure as he described above.

As the Chapter 7 Trustee's local counsel, Guthals submitted an affidavit, Ex. C attached to his employment application. In his affidavit Guthals described his representation of a former client, American Equipment Leasing, in the Chapter 11

case. He testified he obtained waivers of conflict from American Equipment Leasing, CitiCapital, and the Chapter 7 Trustee.

### 4. Jerome Shulkin.

Shulkin was one of two experts called by Perkins to testify on the disclosure required in Montana under Rule 2014. Shulkin was lead counsel for the official unsecured creditors committee ("UCC") while this case was in Chapter 11. Ex. 14. He testified he has practiced exclusively in bankruptcy law, Chapters 11 and 12, since 1957. Shulkin testified that Wells Fargo's limitation of its conflicts waiver in Ex. 1 was not significant, because the hard negotiations involving carve-outs and DIP financing were between the UCC and Wells Fargo, not between the Debtor and Wells Fargo. He testified that he did not view Perkins' relationship with Wells Fargo as a significant hindrance to its representation of the Debtor, and that Perkins' performance added benefit to the estate. He considered the results in this case to be a successful conclusion, because it was apparent early in the case that there was little likelihood the creditors would get anything and it was important to keep the business in the State and employees retained.

Shulkin testified that he has not in his practice seen a conflicts waiver letter filed with a court, and that the fallback position of bringing in another law firm is the way to deal with conflicts as they arise. He testified that he is familiar with the practice in Montana of disclosure of conflicts, and that Perkins' disclosure was consistent with the rule in the District of Montana.

### 5. Harold Van Dye.

Dye was employed as local counsel by the Debtor in Chapter 11, and testified as Perkins' expert on the standard of whether

Perkins' disclosures of its connections with Wells Fargo satisfied its obligations under Rule 2014(a) and the standard for practice in the District of Montana. Dye testified that in his opinion Perkins' disclosures satisfied the applicable standard. He testified that Perkins' affidavit and declarations, Ex. 18, 19, and 20, fully advised the Court that if a conflict arose Perkins would obtain a waiver or use other counsel as a fallback. He testified that the U.S. Trustee is advocating a more stringent standard than presently exists in this Court.

Dye testified that it is possible that potential conflicts may ripen into actual conflicts, and that in Montana bankruptcies, which generally involve smaller law firms, conflicts arise less often than in large firms, but that the fallback arrangement had him prepared to step in any time a conflict arose in this case. Looking at Guthals' affidavit of which the Court took judicial notice, Dye testified that a conflict of interest might arise for Guthals in the form of a § 506(c) surcharge against American Equipment Leasing[21]. When asked on cross examination whether such a conflict would be absolute, Dye testified that an unwaivable conflict is a direct adverse representation of a client.

## CONTENTIONS OF THE PARTIES

The U.S. Trustee contends that Perkins' failure to disclose the conflicts waiver limitations it reached with Wells Fargo and GECC mere material and failed Perkins' duty under applicable Rules of Professional Responsibility, and failed the higher standard under the Bankruptcy Code, 11 U.S.C. § 327(a), and F.R.B.P. 2014(a). The U.S. Trustee argues that authority and case law in the Ninth Circuit and this Court impose a higher duty to disclose all facts that may be pertinent to a determi-

nation under § 327(a), that such duty is strictly applied and continuing and that Perkins' failure to disclose the limitations in its conflicts waivers violated that duty and is sanctionable by disqualification of Perkins as Debtor's attorney, disgorgement of all fees received by Perkins, and disallowance of all compensation incurred. Perkins is not excused, the U.S. Trustee contends, from its failure to disclose the limitations of the conflicts waivers either by the Debtor's waiver of any claims against Wells Fargo, or because no actual conflict arose, or by Perkins "fallback" position that if an actual conflict arose it would obtain additional waivers or refer matters involving Perkins' conflict to local counsel Dye or another attorney.

Perkins contends that its three (3) Rule 2014 disclosures satisfied the letter and spirit of the law, that the "no litigation" waiver with Wells Fargo was fully disclosed to the Debtor and had no impact on its representation of the Debtor, to which Perkins asserts it provided valuable services. Perkins argues that there is no evidence it willfully chose not to disclose the limitations of conflict waivers, and that such limitations were not material and did not affect the Debtor or creditors, including Wells Fargo which was not a significant client, in the least. Perkins argues that both it and Wells Fargo interpreted the waiver as encompassing all bankruptcy matters notwithstanding the "no litigation" language, and further argues that Perkins "at no time" performed any work adverse to Wells Fargo that was not within the scope of the waiver obtained from Wells Fargo. Perkins contends that its fallback position of referring conflict matters to Dye functioned as designed and had no effect on the estate. Perkins concludes that the harsh penalties sought by the U.S.

---

**21.** Guthals testified that American Equipment Leasing was acquired by CitiCapital, and thereafter ceased to exist. That evidence is uncontroverted by Dye.

Trustee are inappropriate, and that the Court should take into consideration in its discretion the positive results obtained in this case.

## DISCUSSION

Whether or not Perkins' disclosure complied with its obligations under the rules of professional responsibility is primarily a matter between Perkins and Wells Fargo, and the Court need not decide between the opinions of Jarvis and Boerner about whether Perkins violated its duty under those rules. The issue before this Court is whether Perkins' failure to disclose to the Court the exceptions to Wells Fargo's waiver of conflicts in Ex. 1 violated Perkins' duty of disclosure under Rule 2014(a), where MacIntyre made three declarations to the Court (Ex. 18, 19, and 20) that Perkins "continues to review its connections" and "will notify the Court if any actual conflicts of interest or other significant connections are discovered".

Perkins sought and was granted approval of its employment as a professional for the Debtor pursuant to § 327(a), which provides that a trustee [22], "with the court's approval, may employ one or more attorneys ... that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." "Disinterested person" is defined at 11 U.S.C. § 101(14) as a person that is not, among other things, a creditor, equity security holder, or insider of the debtor and that "(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security

holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ..., or for any other reason."

### I. Disclosure Under Rule 2014(a).

Perkins was required in its employment application to comply with Rule 2014(a). F.R.B.P. Rule 2014(a) requires that an attorney's application for employment disclose, among other things, "all of the [applicant's] connections with the debtor, creditors, [or] any other party in interest...." to assist the court in ensuring that the attorney has no conflicts of interest and is disinterested, as required by 11 U.S.C. § 327(a). *In re Park–Helena Corp.* ("*Park–Helena*"), 63 F.3d 877, 881 (9th Cir.1995), *cert. denied, Neben & Starrett, Inc. v. Chartwell Financial Corp.*, 516 U.S. 1049, 116 S.Ct. 712, 133 L.Ed.2d 667 (1996). The Ninth Circuit in *Park–Helena* explained:

> The bankruptcy court must ensure that attorneys who represent the debtor do so in the best interests of the bankruptcy estate. *See In re Lincoln N. Assocs., Ltd.*, 155 B.R. 804, 808 (Bankr. E.D.Mass.1993); *In re EWC, Inc.*, 138 B.R. 276, 280–81 (Bankr.W.D.Okla. 1992). The court must ensure, for example, that the attorneys do not have interests adverse to those of the estate, 11 U.S.C. § 327, that the attorneys only charge for services that benefit the estate, *Pfeiffer v. Couch (In re Xebec)*, 147 B.R. 518, 523 (9th Cir. BAP 1992), and that they charge only "reasonable" fees, 11 U.S.C. § 329(b). To facilitate the court's policing responsibilities, the Bankruptcy Code and Federal Rules of

**22.** A debtor in possession has rights, powers and duties of a trustee pursuant to 11 U.S.C. § 1107(a). Section 1107(b) provides that notwithstanding § 327(a), a person is not disqualified for employment under § 327 by a debtor in possession "solely because of such person's employment by or representation of a debtor before the commencement of the case."

Bankruptcy Procedure impose several disclosure requirements on attorneys who seek to represent a debtor and who seek to recover fees. See 11 U.S.C. § 329; Fed.R.Bankr.P. 2014 & 2016. The disclosure rules impose upon attorneys an independent responsibility. Thus, failure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule. [*In re Film Ventures Int'l, Inc.*, 75 B.R. 250, 252 (9th Cir. BAP 1987)].

*Park–Helena*, 63 F.3d at 880.

■ Perkins asserts that the term "connections" is not defined in Rule 2014(a) or the Code. However, Rule 2014(a) has long been held to be read broadly. *In re Fjeldheim ("Fjeldheim")*, 12 Mont. B.R. 267, 278, 1993 WL 590145 (Bankr.D.Mont. 1993); *In re Love ("Love")*, 163 B.R. 164, 170–71 (Bankr.D.Mont.1993); *EWC*, 138 B.R. at 280.

Perkins cites an ABI journal article[23] which describes the language of *Park–Helena* requiring all connections to be fully disclosed, "no matter how *de minimis*", as "sweeping dicta". Perkins' Brief, pp. 18–19. In this Circuit *Park–Helena* is binding precedent, not "sweeping dicta" that may be dismissed as dicta. *Silveira v. Lockyer*, 312 F.3d 1052, 1063 n. 10 (9th Cir.2002). Hence, while the cases from the Southern District of New York and other circuits cited by Perkins, *In re Enron Corp.*, 2003 U.S. Distr. Lexis 1442, *19–20, 2003 WL 223455, *4

(U.S.D.C.S.D.N.Y.2003), *In re Granite Partners L.P.*, 219 B.R. 22, (Bankr. S.D.N.Y.1998), and *A.V. By Versace v. Versace S.p.A.*, 160 F.Supp.2d 657, 662–63 (S.D.N.Y.2001), are illustrative, they are not binding on this Court like *Park–Helena*[24].

■ The disclosure rules "are applied literally, even if the results are sometimes harsh." *Park–Helena*, 63 F.3d at 881; *see In re Plaza Hotel*, 111 B.R. at 883. The disclosure requirements of Rule 2014 are applied as strictly as the requirements of Rule 2016 and 11 U.S.C. § 329, and do not give the attorney the right to withhold information because it is not apparent to him or her that a conflict exists. *Park–Helena*, 63 F.3d at 881, quoting *In re Haldeman Pipe & Supply Co.*, 417 F.2d 1302, 1304 (9th Cir.1969). Thus, *"All facts that may be pertinent* to a court's determination of whether an attorney is disinterested or holds an adverse interest to the estate must be disclosed." *Park–Helena*, 63 F.3d at 882 (emphasis added in *Park–Helena*), quoting *In re Hathaway Ranch Partnership ("Hathaway")*, 116 B.R. 208, 219 (Bankr.C.D.Cal.1990); *In re EWC*, 138 B.R. at 280–81 ("The duty of professionals is to disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and parties in interest.... They cannot pick and choose which connections are irrelevant or trivial.... No matter how old the connection, no matter how trivial it appears, the professional seeking employment must disclose it."); *In re B.E.S. Concrete Prods.*, 93 B.R. at 236 ("Appearances

---

**23.** C.R. Bowles Jr., "Straight & Narrow: Fighting Nazgul, Trolls and Ores is Easy; Disclosing Under Rule 2104 is Hard", ABI Journal, Apr. 2003, at 62.

**24.** Even the district court in *Enron* wrote that "Rule 2014 disclosures are to be strictly construed and failure to disclose relevant connec-

tions is an independent basis for the bankruptcy court to disallow fees or to disqualify the professional from the case." *In re Enron Corp.*, 2003 WL 223455, *4 (S.D.N.Y.); *In re The Leslie Fay Co., Inc.*, 175 B.R. 525, 533 (Bankr.S.D.N.Y.1994).

count. Even conflicts more theoretical than real will be scrutinized.").

 MacIntyre and Smith both testified that it did not occur to them to disclose the no litigation exception to Wells Fargo's conflicts waiver because they did not think it important. Tr. Smith, pp. 27–28; Tr. Macintyre, pp. 55, 57, 58–59. Perkins argues its failure to disclose was not willful. However, negligent or inadvertent omissions "do not vitiate the failure to disclose." *Park–Helena*, 63 F.3d at 881, quoting *In re Maui 14K, Ltd.*, 133 B.R. 657, 660 (Bankr.D.Haw.1991). Smith, MacIntyre and Shulkin each testified that the no litigation exception was not important or material because it did not encompass matters in the bankruptcy case. Whether or not that is so[25], Perkins had the duty to disclose the exceptions to conflicts waivers by Wells Fargo and GECC to the Court. It did not have the right to pick and choose which connections were unimportant or trivial. *Park–Helena*, 63 F.3d at 881; *In re EWC*, 138 B.R. at 280–81. Having advised the Court in three declarations, Ex. 18, 19, and 20, that it has disclosed all "potential conflicts", "continues to review" its connections, and "will notify the Court if any actual conflicts of interest or other significant connections are discovered", Perkins was unarguably required to disclose Wells Fargo's exceptions to its conflicts waivers set forth in Ex. 1.

Wells Fargo was the Debtor's largest creditor, and with Harris was the only source of DIP financing without which everyone agreed the company would close. Ex. D, McConnell, p. 67; Tr. MacIntyre, p. 17; Tr. Smith, p. 12. By the time MacIntyre filed Ex. 20 in August of 2001, Wells Fargo's exception to its conflicts waiver in Ex. 1 was known to Perkins for almost 2 months, and MacIntyre stated in Ex. 20 that he undertook "an investigation of any connections that may exist" between Perkins and the Debtor, and creditors of the Debtor, yet failed to disclose Wells Fargo's exception to its conflict waiver. Compared with Ex. 19's disclosure of family relationships between Perkins and Jore, and with the District of Montana, Perkins' failure to disclose to the Court in Ex. 20 or later the exceptions to a conflicts waiver by the estate's largest creditor and DIP lender which was also Perkins' client, which Smith admitted in Ex. 1 "creates a conflict of interest", is shocking.

Based upon the above language from *Park–Helena*, *Hathaway*, and *EWC*, this Court finds that Perkins' failure to disclose the exceptions to Wells Fargo's conflicts waiver, and GECC's exceptions, to the Court violated its duty of disclosure under Rule 2014(a), and MacIntyre's and Smith's opinion that the exceptions were not important and that their failure to disclose was not intentional or willful is no excuse. *Park–Helena*, 63 F.3d at 881–82; *In re EWC*, 138 B.R. at 280–81; *Hathaway*, 116 B.R. at 219; *In re Coastal Equities, Inc.*, 39 B.R. 304, 308 (Bankr.S.D.Cal.1984).

---

25. Smith testified that neither side believed that the litigation exception encompassed adverse matters in the bankruptcy. In Ex. 3, Wells Fargo's attorney Clark called Smith's contention that the carve-out and § 506(c) surcharge were covered by the waiver in Ex. 1 "incredulous". Wells Fargo's position on the no litigation exception to its conflicts waiver was that Perkins would not sue Wells Fargo on behalf of Jore *"Period"*. Ex. 3. Shulkin and MacIntyre testified that everything in a bankruptcy proceeding is "litigation". Ex. 14, p. 3; Tr. MacIntyre, p. 34. But Clark even questioned the distinterestedness of Perkins in opposing bidding by Western Mortgage. Ex. 3. Jarvis and Boerner agreed that it was Wells Fargo's right whether to assert the no litigation to its conflicts waiver, but clearly Perkins and Wells Fargo did not agree on what encompassed "litigation" in Ex. 1, which made it all the more reason for Perkins to disclose Wells Fargo's exception to its conflict waiver under Rule 2014.

█ Perkins' contention that it satisfied Rule 2014(a)'s disclosure requirements because it disclosed Wells Fargo's exception to its conflict waiver to the Debtor is without merit, because Perkins's duty under Rule 2014 was to file and disclose all of its connections with the Court, not just disclose to its client. *Park–Helena*, 63 F.3d at 881–82; Rule 2014(a). Likewise, the Court rejects Perkins' arguments that its failure to disclose had no impact on its representation of the Debtor because the Debtor waived all claims against Wells Fargo [26], that Perkins provided valuable services to the estate, and that its fallback strategy to refer conflict matters to Dye functioned as designed. None of these arguments excuse or mitigate Perkins' failure to disclose Wells Fargo's exception to its conflict waiver to the Court as required by Rule 2014 [27]. A disclosure violation may result in sanctions "regardless of actual harm to the estate." *Park–Helena*, 63 F.3d at 881, quoting *In re Maui 14K*, 133 B.R. at 660.

As to Perkins' contention, supported by the testimony of Dye, Smith and Shulkin that conflict waiver letters are not routinely filed, the Court views that argument as a red herring. Regardless of whether a professional decides to file an actual conflict waiver letter, Rule 2014(a) plainly requires disclosure of "all of the person's connections with the debtor, creditors, ...." Smith and MacIntyre admitted that they did not disclose Wells Fargo's no litigation exception to its conflicts waiver.

---

**26.** That waiver was based upon the Final DIP Financing Order, which Perkins later sought to avoid to pursue its carve-out and 506(c) surcharge claims against Wells Fargo notwithstanding similar waivers the Final DIP Financing Order. Ex. 3, 4, 5, 6, 7.

**27.** If lack of impact on the estate or a fallback position are to be accepted as exceptions from the Rule 2014(a) disclosure requirements,

Tr. MacIntyre, pp. 55, 57; Tr. Smith, pp. 27–28, 82.

## II. Court Discretion Under Rule 2014(a).

█ This Court has broad discretion in determining whether to deny or award fees when a debtor's attorney has failed to disclose material facts. *Park–Helena*, 63 F.3d at 881 (bankruptcy court correctly denied fees to attorneys who willfully failed to disclose all their connections with the debtor, creditors, and any other party in interest); *Love*, 163 B.R. at 170–71, 13 Mont. B.R. at 24–35. The Ninth Circuit bolstered *Park–Helena* in *In re Lewis*, 113 F.3d 1040, 1045 (9th Cir.1997), holding that an attorney's failure to obey the disclosure and reporting requirements of the Bankruptcy Code and Rules gives the bankruptcy court discretion to order disgorgement of attorney's fees. *Lewis* explains:

> After noting [in *Park–Helena*] that "[e]ven a negligent or inadvertent failure to disclose fully relevant information [in a Rule 2016 statement] may result in a denial of all requested fees," *id.* at 882, we concluded that the bankruptcy court was within its discretion when it refused to approve the entire amount. *Id.* (citing *In re Hathaway Ranch Partnership*, 116 B.R. 208, 220 (Bankr.C.D.Cal.1990); *In re Crimson Invs.*, 109 B.R. 397, 402 (Bankr.D.Ariz.1989)).
>
> Although we did not explicitly so recognize in *In re Park–Helena*, the bankruptcy court's authority to deny com-

then those are matters to be addressed by Congress or the drafters of the Federal Rules of Bankruptcy Procedure. Likewise, if the effect of Rule 2014(a) as presently written is to discourage large firms from undertaking representation of debtors, as Perkins contends, that also is a matter to be addressed by Congress if it deems it necessary or appropriate.

pletely these attorney's fees was grounded in the inherent authority over the debtor's attorney's compensation. The Bankruptcy Code contains a number of provisions (e.g., §§ 327, 329, 330, 331) designed to protect the debtor from the debtor's attorney. *See, e.g., In re Walters,* 868 F.2d 665, 668 (4th Cir.1989) (noting that § 329 and Rule 2017 are designed to protect the creditors and the debtor against overreaching by attorney). As a result, several courts have recognized that the bankruptcy court has broad and inherent authority to deny any and all compensation when an attorney fails to meet the requirements of these provisions. *See, e.g., In re Downs,* 103 F.3d 472, 479 (6th Cir. 1996) ("[T]he bankruptcy court should deny all compensation to an attorney who exhibits a willful disregard of his fiduciary obligations to fully disclose the nature and circumstances of his fee arrangement under § 329 and Rule 2016. The authority to do so is inherent, and in the face of such infractions should be wielded forcefully."); *Matter of Prudhomme,* 43 F.3d 1000, 1003 (5th Cir. 1995) ("Additionally, the court's broad discretion in awarding and denying fees paid in connection with bankruptcy proceedings empowers the bankruptcy court to order disgorgement as a sanction to debtors' counsel for nondisclosure."); *In re Chapel Gate Apartments, Ltd.,* 64 B.R. 569, 575 (Bankr.N.D.Tex. 1986) ("Indeed, a failure of counsel to obey the mandate of § 329 and Rule 2016 concerning disclosure, and by implication review by the Court, is a basis for entry of an order denying compensation and requiring the return of sums already paid.").

We agree with these courts, and so we have little difficulty in rejecting Franke's argument that the bankruptcy court's disgorgement order must be re-versed because the court made no findings of excessiveness under § 329(b). An attorney's failure to obey the disclosure and reporting requirements of the Bankruptcy Code and Rules gives the bankruptcy court the discretion to order disgorgement of attorney's fees. In reaching this conclusion, we do not mean to say that the excessiveness or reasonableness of those fees is irrelevant in all cases; in appropriate circumstances, a bankruptcy court should inquire into these subjects as part of deciding whether and to what extent to order disgorgement. *See, e.g., In re Film Ventures Int'l, Inc.,* 75 B.R. 250, 253 (9th Cir. BAP 1987).

A bankruptcy court must be able to rely on the veracity of the representations made by an attorney in an application for employment. A bankruptcy court must be certain that an attorney who has filed a Rule 2016(b) statement will supplement that statement if further compensation is received. Here, the bankruptcy court was able to do neither. Not only did Franke fail to supplement its Rule 2016(b) statements, but Franke included a false statement in its application for employment.

In light of Franke's transgressions, we cannot conclude that the bankruptcy court clearly erred when it concluded as a factual matter that Franke acted with "complete disregard" for the procedures and requirements of the Bankruptcy Rules and the Bankruptcy Code. Having reached that conclusion, the bankruptcy court had discretion over whether to permit Franke to receive any fees at all, regardless of their excessiveness or reasonableness. *See In re Park–Helena,* 63 F.3d at 882. Given the gravity of Franke's transgressions, an inquiry into the appropriate amount of the fee was

not required, and the bankruptcy court did not abuse its discretion. *In re Lewis,* 113 F.3d at 1045–46.

The provisions of Rule 2014 are imposed as strictly, and impose an independent duty on attorneys, as the disclosure provisions of § 329 and Rule 2016 discussed in *Lewis. Park–Helena,* 63 F.3d at 881–82. Therefore, it makes no difference as Perkins contends, that *Lewis, Park–Helena,* and *Fjeldheim* each involved violations of both Rules 2014 and 2016.

As in *Lewis,* the Debtor's attorney MacIntyre made a false statement when he stated in Ex. 20, dated 2 months after Ex. 1, that Ex. 20 "discloses all additional issues and potential conflicts of interest that have been identified at the present time." Ex. 1 included exceptions to Wells Fargo's and GECC's conflicts waiver which Perkins was required to disclose. MacIntyre's statement in Ex. 20 was false because there remained a dispute over the extent of Wells Fargo's waiver of conflict between Perkins' attorneys and Wells Fargo, which was not disclosed to the Court until after the Debtor's assets were sold and contested matters litigated. In Ex. 19 MacIntyre declared that Perkins received oral waiver of conflict, and was in the process of obtaining written waiver. Wells Fargo's written waiver in Ex. 1 contained exceptions which were additional issues MacIntyre failed to disclose in Ex. 20 despite representing to the Court that "all additional issues and potential conflicts of interest that have been identified at the present time."

 Negligent or inadvertent as well as willful failure to disclose fully relevant information required under Rule 2014 may result in a denial of all fees. *Park–Helena,* 63 F.3d at 882; *In re Maui 14K,* 133 B.R. at 660; *In re Coastal Equities,* 39 B.R. at 308. Denial of all of Perkins' fees is within this Court's discretion. *Park–*

*Helena,* 63 F.3d at 882; *In re Maui 14K,* 133 B.R. at 660; *In re Coastal Equities,* 39 B.R. at 308; *Hathaway,* 116 B.R. at 220 (applicant who fails to provide complete disclosure may be ordered to disgorge previously paid compensation).

The Court notes that in one case in this circuit the Bankruptcy Appellate Panel reversed a fee award and remanded with instructions to deny all compensation and require that a debtor's attorneys disgorge all fees received by counsel which failed to disclose a conflict and continued to represent the debtor after the conflict was recognized and challenged. *See, In re Mirzai,* 236 B.R. 8, 9 (9th Cir. BAP 1999). The BAP's decision was affirmed by the Ninth Circuit. *In re Mirzai,* 203 F.3d 832 (9th Cir.1999) (Table). This Court is not inclined to exercise its discretion in Perkins' favor given its failure to disclose the plain conflict of interest in the instant case and the limiting language of the "no litigation" letter after representing to the Court by declaration that oral waivers had been obtained.

 Factors which weighed in favor of full disgorgement in *Love* are present in this case. First is Perkins' failure of its duty of disclosure. *Love,* 163 B.R. at 171. Second, Perkins' attorneys are experienced bankruptcy attorneys and familiar with the duty of disclosure, but contend that their duty did not require disclosure of the exceptions to Wells Fargo's conflicts waiver from Ex. 1. Third, while Perkins contends that Wells Fargo was not a large client of Perkins that would call into question its ability or desire to vigorously advocate on behalf of the Debtor, Wells Fargo was the largest creditor and the DIP finance lender, without which it is uncontested the Debtor would have had to close its doors. Finally, Perkins failed to disclose the exception to Wells Fargo's con-

flicts waiver in spite of numerous representations (Ex. 18, 19, and 20) that it had investigated its connections, continues to review and monitor its connections, and that it "will notify the Court if any actual conflicts of interest or other significant connections are discovered". The fact that Perkins ultimately disclosed the exceptions to Wells Fargo's conflicts waiver in the Status Report and Dye's second application filed June 14, 2002, after the DIP financing dispute was concluded and substantially all of Debtor's assets were sold, does not excuse Perkins' failure to timely disclose. It was not the Court's, the U.S. Trustee's or anyone else's duty to search the file for any conflicts of interest. *Love,* 163 B.R. at 169–70, 13 Mont. B.R. at 32–33, quoting *Fjeldheim,* 12 Mont. B.R. at 277–78; *Hathaway,* 116 B.R. at 219.

Perkins cites several cases from other circuits in support of its argument that *de minimis* failures to disclose should not result in disqualification and disgorgement. While such cases are illustrative, they are not binding on this Court as are *Lewis* and *Park–Helena.* Neither are they consistent with this Court's long-standing rule from *Love* [28]. In *Park–Helena* the Ninth Circuit cited cases such as *EWC, Hathaway, Film Ventures, Saturley,* and *In re B.E.S. Concrete Prods., Inc.,* which this Court cited in *Love,* and *Love* remains good law in this district. In any event, Perkins' failure to disclose the exceptions to Wells Fargo's and GECC's conflict of interest cannot be construed as a *de minimis* failure.

Having determined that Perkins violated the disclosure rules of Rule 2014(a) by failing to disclose the terms of Wells Fargo's exceptions from its conflicts waivers while filing a declaration with the Court

that all potential conflicts have been identified and disclosed, that Perkins continues to review its connections and will notify the Court if any actual conflicts arise, this Court need not revisit its rule from *Love* that such a violation is enough to disqualify a professional, deny compensation and order disgorgement of fees regardless of whether the undisclosed connections were materially adverse to the estate or *de minimis. Love,* 13 Mont. B.R. at 32–33, 163 B.R. at 168 (quoting *In re Fjeldheim,* 12 Mont. B.R. 267, 278 (Bankr.D.Mont.1993)); *EWC,* 138 B.R. at 280; *Hathaway,* 116 B.R. at 219–220.

The Court reiterates that it does not view Perkins' failure to disclose the exceptions of Wells Fargo's conflict waiver as *de minimis* by any definition. Wells Fargo was the largest creditor in this case under Chapter 11, and was the DIP lender without which Smith, McConnell, Hamstreet and MacIntyre all testified the Debtor would have to close its doors. By failing to disclose Wells Fargo's limitations to its conflict waiver, Perkins failed to disclose an actual conflict of interest with the largest creditor in the case involved in arguably the most important issue in the entire case, DIP financing. This undisclosed conflict of interest was not *de minimis.*

Neither in this Court's view was Perkins' failure to disclose excusable because the Debtor waived claims against Wells Fargo or the fallback position of using Dye for conflict matters. Section 327(c) provides that in a Chapter 11 case, "a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States

[28]. This Court's decision in *Love* was appealed to the BAP, but the appeal was dismissed by stipulation of the parties on March 7, 1994.

trustee, in which case the court *shall* disapprove such employment if there is an actual conflict of interest." This statutory language is not ambiguous. The Ninth Circuit provides the following guidance in statutory interpretation:

> The first and most important step in construing a statute is the statutory language itself. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We look to the text of the statute to "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Our inquiry ceases if from the plain meaning of the statute congressional intent is unambiguous, and the statutory scheme is coherent and consistent. *Id.*

*Eskanos & Adler, P.C. v. Leetien,* 309 F.3d 1210, 1213 (9th Cir.2002).

■ Courts must presume that a legislature says in a statute what it means and means in a statute what it says there. *Connecticut National Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241–242, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989). Applying this guidance, the U.S. Trustee objects to Perkins' employment because of its failure to disclose the limitations of Wells Fargo's conflicts waiver. Ex. 1 shows that there is an actual conflict, which Smith and MacIntyre admitted existed and which was not waived in the case of litigation. Thus, the plain language of § 327(c) requires disapproval of Perkins' employment. This is not a case where the debtor sought to appoint counsel only as special counsel, for a specific matter, in which case there need only be no conflict between the debtor and counsel's creditor client with respect to the specific matter itself. *See Stoumbos v. Kilimnik,* 988 F.2d 949, 964 (9th Cir.1993), *cert. denied,* 510 U.S. 867, 114 S.Ct. 190, 126 L.Ed.2d 148 (1993).

■ Perkins argues that its experts Dye and Shulkin each testified that its disclosures in this case satisfied this Court's standard for practice. The determination of the weight to be given expert testimony or evidence is a matter within the discretion of the trier of fact—which in a bench trial like the instant is the bankruptcy court. *Fox v. Dannenberg,* 906 F.2d 1253, 1256 (8th Cir.1990); *Arkwright Mutual Insurance Co. v. Gwinner Oil Inc.,* 125 F.3d 1176, 1183 (8th Cir.1997); Barry Russell, *Bankruptcy Evidence Manual,* 2000 Ed., § 702.2. Perkins cites *Aguilar v. International Longshoremen's Union,* 966 F.2d 443, 447 (9th Cir.1992) for the proposition that the Court, not the expert, decides the legal requirements for disclosure under Rule 2014. The Court agrees, and gives little probative weight to Dye's and Shulkin's expert testimony regarding this Court's requirements for disclosure under Rule 2014 because that is a matter for the Court[29]. Boerner relied on Dye's and Shulkin's opinion in forming his own opinion, so his opinion carries the same lack of probative weight.

As discussed above, the Court concludes that Perkins' disclosure failed to satisfy its long-standing standard for disclosure under Rule 2014(a) from *Love.* The fact that two "experts" testified that such a failure to disclose an actual unwaived conflict of interest with the largest creditor involved

---

**29.** From the result in this case, Guthals' expert testimony comes much closer to describing the applicable standard discussed in *Love* requiring continuing, complete disclosure of limitations to a waiver of conflicts.

in the most important issue in the case satisfied this Court's standard, gives the Court further reason to impose the full harsh penalties of disqualification of Perkins from employment, and denial and disgorgement of all fees.

### III. Case Management Order.

■ The Court recognizes that this decision is a harsh result, and a hardship on Perkins. The Court deems it appropriate to temper its decision in one limited area. The Court's "Case Management Order" was entered on July 5, 2001 because of the number of creditors and to minimize the expense and delay. The Case Management Order made Perkins responsible for serving orders entered by the Court, and for processing and maintaining claims and interests registers, thereby relieving the Clerk of Court of a large part of the burden and expense incurred in this case. The Court views Perkins expenses incurred in complying with the Case Management Order as beneficial to creditors, the parties, the estate, and the Court, and concludes that it is appropriate to allow Perkins reimbursement for its expenses incurred in complying with the Case Management Order[30].

Perkins' Brief states that it has applied for reimbursement of $215,765.77 in expenses and has received $161,571.82, but there is no evidence in the record showing how much of those expenses were incurred by Perkins in complying with the Case Management Order. Neither is there any way for the Court to reliably estimate that proportion of expenses from the total expenses included in Perkins' three fee applications. Accordingly, Perkins will be given the opportunity to submit a request

limited to such expenses incurred in complying with the Case Management Order, and the parties will have the opportunity to review and file responses.

### CONCLUSIONS OF LAW

1. This Court has original and exclusive jurisdiction of this bankruptcy case pursuant to 28 U.S.C. § 1334(a).

2. The U.S. Trustee's Motion is a core proceeding under 28 U.S.C. § 157(b)(2).

3. Perkins failed to satisfy its duty under Rule 2014(a) to disclose all of its connections with creditors when it failed to disclose the limitations to Wells Fargo's waiver of conflicts in Ex. 1, while stating to the Court that it has disclosed all conflicts, continues to review its connections with creditors and will notify the Court of any actual conflicts of interest are discovered.

4. The Court concludes that it is an appropriate exercise of its discretion to grant the U.S. Trustee's "Motion to Disqualify Perkins Coie, Vacate Employment Order, and Disgorge and Disallow Fees", and to disqualify Perkins as Debtor's attorneys, vacate the Employment Order authorizing Perkins' employment by the Debtor, disallow all fees and costs incurred by Perkins in this case, and to order Perkins to disgorge all fees and costs received to date.

5. The Court deems it appropriate in the interests of justice and to alleviate hardship to allow Perkins the opportunity to submit an application for reimbursement of expenses incurred in complying with this Court's Case Management Order entered July 5, 2001.

**IT IS ORDERED** a separate Order and Judgment shall be entered in accordance

---

**30.** Such reimbursement would not include any attorney's fees or lodging, meals, airfare or other travel expenses incurred by Perkins. Rather it would only consist of postage, copy costs, and some telephone and facsimile expenses directly related to complying with the Case Management Order.

with the above granting the U.S. Trustee's "Motion to Disqualify Perkins Coie, Vacate Employment Order, and Disgorge and Disallow Fees" filed March 5, 2003; which shall provide that Perkins Coie will be disqualified from its employment by the Debtor and the Order authorizing the Debtor to employ Perkins Coie entered June 28, 2001, will be vacated, and ordering Perkins Coie to disgorge all compensation, fees and costs received from the Debtor during the pendency of this bankruptcy case., except to the allowance that may be provided to cover expenses and expenses incurred by Perkins Coie in complying with the Case Management Order.